**EVRA CORPORATION, formerly Hyman-Michaels Company, Plaintiff-Appellee and Counterplaintiff-Appellant,**

v.

**SWISS BANK CORPORATION, Defendant-Appellant and Third-Party-Plaintiff-Appellant,**

v.

**CONTINENTAL ILLINOIS NATIONAL BANK AND TRUST COMPANY OF CHICAGO, Third-Party-Defendant-Appellee and Counterdefendant-Appellee.**

**Nos. 81–1925, 81–1926.**

United States Court of Appeals, Seventh Circuit.

Argued Feb. 17, 1982.

Decided March 19, 1982.

Rehearing and Rehearing En Banc Denied June 21, 1982.

plaint is moot in light of the relief granted by the National Labor Relations Board.

Jeffrey Barist, White & Case, New York City, John L. Conlon, Hopkins & Sutter, Chicago, Ill., for defendant-appellant and third-party-plaintiff-appellant.

Joel J. Sprayregen, Arron, Schimberg, Hess, Rusnak, Deutsch & Gilbert, Alan N. Salpeter, Mayer, Brown & Platt, Chicago, Ill., for third-party-defendant-appellee and counterdefendant-appellee.

Before SWYGERT, Senior Circuit Judge, and WOOD and POSNER, Circuit Judges.

POSNER, Circuit Judge.

The question—one of first impression—in this diversity case is the extent of a bank's liability for failure to make a transfer of funds when requested by wire to do so. The essential facts are undisputed. In 1972 Hyman-Michaels Company, a large Chicago dealer in scrap metal, entered into a two-year contract to supply steel scrap to a Brazilian corporation. Hyman-Michaels chartered a ship, the *Pandora*, to carry the scrap to Brazil. The charter was for one year, with an option to extend the charter for a second year; specified a fixed daily rate of pay for the hire of the ship during both the initial and the option period, payable semi-monthly "in advance"; and provided that if payment was not made on time the *Pandora*'s owner could cancel the charter. Payment was to be made by deposit to the owner's account in the Banque de Paris et des Pays-Bas (Suisse) in Geneva, Switzerland.

The usual method by which Hyman-Michaels, in Chicago, got the payments to the Banque de Paris in Geneva was to request the Continental Illinois National Bank and Trust Company of Chicago, where it had an account, to make a wire transfer of funds. Continental would debit Hyman-Michaels' account by the amount of the payment and then send a telex to its London office for retransmission to its correspondent bank in Geneva—Swiss Bank Corporation—asking Swiss Bank to deposit this amount in the Banque de Paris account of the *Pandora*'s owner. The transaction was completed by the crediting of Swiss Bank's account at Continental by the same amount.

When Hyman-Michaels chartered the *Pandora* in June 1972, market charter rates were very low, and it was these rates that were fixed in the charter for its entire term—two years if Hyman-Michaels exercised its option. Shortly after the agreement was signed, however, charter rates began to climb and by October 1972 they were much higher than they had been in June. The *Pandora*'s owners were eager to get out of the charter if they could. At the end of October they thought they had found a way, for the payment that was due in the Banque de Paris on October 26 had not arrived by October 30, and on that day the *Pandora*'s owner notified Hyman-Michaels that it was canceling the charter because of the breach of the payment term. Hyman-Michaels had mailed a check for the October 26 installment to the Banque de Paris rather than use the wire-transfer method of payment. It had done this in order to have the use of its money for the period that it

would take the check to clear, about two weeks. But the check had not been mailed in Chicago until October 25 and of course did not reach Geneva on the twenty-sixth.

When Hyman-Michaels received notification that the charter was being canceled it immediately wired payment to the Banque de Paris, but the *Pandora*'s owner refused to accept it and insisted that the charter was indeed canceled. The matter was referred to arbitration in accordance with the charter. On December 5, 1972, the arbitration panel ruled in favor of Hyman-Michaels. The panel noted that previous arbitration panels had "shown varying degrees of latitude to Charterers"; "In all cases, a pattern of obligation on Owners' part to protest, complain, or warn of intended withdrawal was expressed as an essential prerequisite to withdrawal, in spite of the clear wording of the operative clause. No such advance notice was given by Owners of M/V Pandora." One of the three members of the panel dissented; he thought the *Pandora*'s owner was entitled to cancel.

Hyman-Michaels went back to making the charter payments by wire transfer. On the morning of April 25, 1973, it telephoned Continental Bank and requested it to transfer $27,000 to the Banque de Paris account of the *Pandora*'s owner in payment for the charter hire period from April 27 to May 11, 1973. Since the charter provided for payment "in advance," this payment arguably was due by the close of business on April 26. The requested telex went out to Continental's London office on the afternoon of April 25, which was nighttime in England. Early the next morning a telex operator in Continental's London office dialed, as Continental's Chicago office had instructed him to do, Swiss Bank's general telex number, which rings in the bank's cable department. But that number was busy, and after trying unsuccessfully for an hour to engage it the Continental telex operator dialed another number, that of a machine in Swiss Bank's foreign exchange department which he had used in the past when the general number was engaged. We know this machine received the telexed message because it signaled the sending machine at both the be-

ginning and end of the transmission that the telex was being received. Yet Swiss Bank failed to comply with the payment order, and no transfer of funds was made to the account of the *Pandora*'s owner in the Banque de Paris.

No one knows exactly what went wrong. One possibility is that the receiving telex machine had simply run out of paper, in which event it would not print the message although it had received it. Another is that whoever took the message out of the machine after it was printed failed to deliver it to the banking department. Unlike the machine in the cable department that the Continental telex operator had originally tried to reach, the machines in the foreign exchange department were operated by junior foreign exchange dealers rather than by professional telex operators, although Swiss Bank knew that messages intended for other departments were sometimes diverted to the telex machines in the foreign exchange department.

At 8:30 a.m. the next day, April 27, Hyman-Michaels in Chicago received a telex from the *Pandora*'s owner stating that the charter was canceled because payment for the April 27-May 11 charter period had not been made. Hyman-Michaels called over to Continental and told them to keep trying to effect payment through Swiss Bank even if the *Pandora*'s owner rejected it. This instruction was confirmed in a letter to Continental dated April 28, in which Hyman-Michaels stated: "please instruct your London branch to advise their correspondents to persist in attempting to make this payment. This should be done even in the face of a rejection on the part of Banque de Paris to receive this payment. It is paramount that in order to strengthen our position in an arbitration that these funds continue to be readily available." Hyman-Michaels did not attempt to wire the money directly to the Banque de Paris as it had done on the occasion of its previous default. Days passed while the missing telex message was hunted unsuccessfully. Finally Swiss Bank suggested to Continental that it retransmit the telex message to the machine in the

cable department and this was done on May 1. The next day Swiss Bank attempted to deposit the $27,000 in the account of the *Pandora*'s owner at the Banque de Paris but the payment was refused.

Again the arbitrators were convened and rendered a decision. In it they ruled that Hyman-Michaels had been "blameless" up until the morning of April 27, when it first learned that the Banque de Paris had not received payment on April 26, but that "being faced with this situation," Hyman-Michaels had "failed to do everything in [its] power to remedy it. The action taken was immediate but did not prove to be adequate, in that [Continental] Bank and its correspondent required some 5/6 days to trace and effect the lost instruction to remit. [Hyman-Michaels] could have ordered an immediate duplicate payment—or even sent a Banker's check by hand or special messengers, so that the funds could have reached owner's Bank, not later than April 28th." By failing to do any of these things Hyman-Michaels had "created the opening" that the *Pandora*'s owner was seeking in order to be able to cancel the charter. It had "acted imprudently." The arbitration panel concluded, reluctantly but unanimously, that this time the *Pandora*'s owner was entitled to cancel the agreement. The arbitration decision was confirmed by a federal district court in New York.

Hyman-Michaels then brought this diversity action against Swiss Bank, seeking to recover its expenses in the second arbitration proceeding plus the profits that it lost because of the cancellation of the charter. The contract by which Hyman-Michaels had agreed to ship scrap steel to Brazil had been terminated by the buyer in March 1973 and Hyman-Michaels had promptly subchartered the *Pandora* at market rates, which by April 1973 were double the rates fixed in the charter. Its lost profits are based on the difference between the charter and subcharter rates.

Swiss Bank impleaded Continental Bank as a third-party defendant, asking that if it should be ordered to pay Hyman-Michaels, then Continental should be ordered to indemnify it. Continental filed a cross-claim against Hyman-Michaels seeking to shift back to Hyman-Michaels the cost of any judgment that Swiss Bank might obtain against it, on the ground that any errors by Continental were caused by Hyman-Michaels' negligence. Hyman-Michaels in turn counterclaimed against Continental, alleging that Continental had both been negligent and broken its contract with Hyman-Michaels in failing to effect payment on April 26, and was therefore liable to Hyman-Michaels along with Swiss Bank.

The case was tried to a district judge without a jury. In his decision, 522 F.Supp. 820 (N.D.Ill.1981), he first ruled that the substantive law applicable to Hyman-Michaels' claim against Swiss Bank was that of Illinois, rather than Switzerland as urged by Swiss Bank, and that Swiss Bank had been negligent and under Illinois law was liable to Hyman-Michaels for $2.1 million in damages. This figure was made up of about $16,000 in arbitration expenses and the rest in lost profits on the subcharter of the *Pandora*. The judge also ruled that Swiss Bank was not entitled to indemnification from Continental Bank, which made Continental's cross-claim moot; and lastly he dismissed Hyman-Michaels' counterclaim against Continental on the ground that Continental had not breached any duty to Hyman-Michaels. The case comes to us on Swiss Bank's appeal from the judgment in favor of Hyman-Michaels and from the dismissal of Swiss Bank's claim against Continental Bank, and on Hyman-Michaels' appeal from the dismissal of its counterclaim against Continental Bank.

Logically the first question we should address is choice of law. The parties seem agreed that if Swiss law applies, Hyman-Michaels has no claim against Swiss Bank, because under Swiss law a bank cannot be held liable to someone with whom it is not in privity of contract and there was no contract between Swiss Bank and Hyman-Michaels. Illinois does not have such a privity requirement. But this creates a conflict of laws only if Hyman-Michaels has a good claim against Swiss Bank under

Illinois law; if it does not, then our result must be the same regardless of which law applies. Because we are more certain that Hyman-Michaels cannot recover against Swiss Bank under Illinois law than we are that Swiss rather than Illinois law applies to this case under Illinois choice-of-law principles (which we must apply in a diversity suit tried in Illinois, see *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496–97, 61 S.Ct. 1020, 1021–22, 85 L.Ed. 1477 (1941)), we shall avoid the choice-of-law question and discuss Swiss Bank's liability to Hyman-Michaels under Illinois law without deciding—for, to repeat, it would make no difference to the outcome—whether it really is Illinois law or Swiss law that governs.

When a bank fails to make a requested transfer of funds, this can cause two kinds of loss. First, the funds themselves or interest on them may be lost, and of course the fee paid for the transfer, having bought nothing, becomes a loss item. These are "direct" (sometimes called "general") damages. Hyman-Michaels is not seeking any direct damages in this case and apparently sustained none. It did not lose any part of the $27,000; although its account with Continental Bank was debited by this amount prematurely, it was not an interest-bearing account so Hyman-Michaels lost no interest; and Hyman-Michaels paid no fee either to Continental or to Swiss Bank for the aborted transfer. A second type of loss, which either the payor or the payee may suffer, is a dislocation in one's business triggered by the failure to pay. Swiss Bank's failure to transfer funds to the Banque de Paris when requested to do so by Continental Bank set off a chain reaction which resulted in an arbitration proceeding that was costly to Hyman-Michaels and in the cancellation of a highly profitable contract. It is those costs and lost profits—"consequential" or, as they are sometimes called, "special" damages—that Hyman-Michaels seeks in this lawsuit, and recovered below. It is conceded that if Hyman-Michaels was entitled to consequential damages, the district court measured them correctly. The only issue is whether it was entitled to consequential damages.

If a bank loses a check, its liability is governed by Article 4 of the Uniform Commercial Code, which precludes consequential damages unless the bank is acting in bad faith. See Ill.Rev.Stat. ch. 26, § 4–103(5). If Article 4 applies to this transaction, Hyman-Michaels cannot recover the damages that it seeks, because Swiss Bank was not acting in bad faith. Maybe the language of Article 4 could be stretched to include electronic fund transfers, see section 4–102(2), but they were not in the contemplation of the draftsmen. For purposes of this case we shall assume, as the Second Circuit held in *Delbrueck & Co. v. Manufacturers Hanover Trust Co.*, 609 F.2d 1047, 1051 (2d Cir. 1979), that Article 4 is inapplicable, and apply common law principles instead.

*Hadley v. Baxendale*, 9 Ex. 341, 156 Eng. Rep. 145 (1854), is the leading common law case on liability for consequential damages caused by failure or delay in carrying out a commercial undertaking. The engine shaft in plaintiffs' corn mill had broken and they hired the defendants, a common carrier, to transport the shaft to the manufacturer, who was to make a new one using the broken shaft as a model. The carrier failed to deliver the shaft within the time promised. With the engine shaft out of service the mill was shut down. The plaintiffs sued the defendants for the lost profits of the mill during the additional period that it was shut down because of the defendants' breach of their promise. The court held that the lost profits were not a proper item of damages, because "in the great multitude of cases of millers sending off broken shafts to third persons by a carrier under ordinary circumstances, such consequences [the stoppage of the mill and resulting loss of profits] would not, in all probability, have occurred; and these special circumstances were here never communicated by the plaintiffs to the defendants." 9 Ex. at 356, 156 Eng.Rep. at 151.

The rule of *Hadley v. Baxendale*—that consequential damages will not be awarded unless the defendant was put on notice of the special circumstances giving rise to

them—has been applied in many Illinois cases, and *Hadley* cited approvingly. See, e.g., *Underground Constr. Co. v. Sanitary Dist. of Chicago*, 367 Ill. 360, 369, 11 N.E.2d 361, 365 (1937); *Western Union Tel. Co. v. Martin*, 9 Ill.App. 587, 591–93 (1882); *Siegel v. Western Union Tel. Co.*, 312 Ill.App. 86, 92–93, 37 N.E.2d 868, 871 (1941); *Spangler v. Holthusen*, 61 Ill.App.3d 74, 80–82, 18 Ill.Dec. 840, 378 N.E.2d 304, 309–10 (1978). In *Siegel*, the plaintiff had delivered $200 to Western Union with instructions to transmit it to a friend of the plaintiff's. The money was to be bet (legally) on a horse, but this was not disclosed in the instructions. Western Union misdirected the money order and it did not reach the friend until several hours after the race had taken place. The horse that the plaintiff had intended to bet on won and would have paid $1650 on the plaintiff's $200 bet if the bet had been placed. He sued Western Union for his $1450 lost profit, but the court held that under the rule of *Hadley v. Baxendale* Western Union was not liable, because it "had no notice or knowledge of the purpose for which the money was being transmitted." 312 Ill.App. at 93, 37 N.E.2d at 871.

■ The present case is similar, though Swiss Bank knew more than Western Union knew in *Siegel*; it knew or should have known, from Continental Bank's previous telexes, that Hyman-Michaels was paying the Pandora Shipping Company for the hire of a motor vessel named *Pandora*. But it did not know when payment was due, what the terms of the charter were, or that they had turned out to be extremely favorable to Hyman-Michaels. And it did not know that Hyman-Michaels knew the *Pandora*'s owner would try to cancel the charter, and probably would succeed, if Hyman-Michaels was ever again late in making payment, or that despite this peril Hyman-Michaels would not try to pay until the last possible moment and in the event of a delay in transmission would not do everything in its power to minimize the consequences of the delay. Electronic funds transfers are not so unusual as to automatically place a bank on notice of extraordinary consequences if such a transfer goes awry. Swiss Bank did not have enough information to infer that if it lost a $27,000 payment order it would face a liability in excess of $2 million. Cf. *Snell v. Cottingham*, 72 Ill. 161, 169–70 (1874); *Flug v. Craft Mfg. Co.*, 3 Ill.App.2d 56, 67, 120 N.E.2d 666, 671 (1954).

It is true that in both *Hadley* and *Siegel* there was a contract between the parties and here there was none. We cannot be certain that the Illinois courts would apply the principles of those cases outside of the contract area. As so often in diversity cases, there is an irreducible amount of speculation involved in attempting to predict the reaction of a state's courts to a new issue. The best we can do is to assume that the Illinois courts would look to the policies underlying cases such as *Hadley* and *Siegel* and, to the extent they found them pertinent, would apply those cases here. We must therefore ask what difference it should make whether the parties are or are not bound to each other by a contract. On the one hand, it seems odd that the absence of a contract would enlarge rather than limit the extent of liability. After all, under Swiss law the absence of a contract would be devastating to Hyman-Michaels' claim. Privity is not a wholly artificial concept. It is one thing to imply a duty to one with whom one has a contract and another to imply it to the entire world.

On the other hand, contract liability is strict. A breach of contract does not connote wrongdoing; it may have been caused by circumstances beyond the promisor's control—a strike, a fire, the failure of a supplier to deliver an essential input. See *Globe Ref. Co. v. Landa Cotton Oil Co.*, 190 U.S. 540, 543–44, 23 S.Ct. 754, 755–56, 47 L.Ed. 1171 (1903). And while such contract doctrines as impossibility, impracticability, and frustration relieve promisors from liability for some failures to perform that are beyond their control, many other such failures are actionable although they could not

have been prevented by the exercise of due care. The district judge found that Swiss Bank had been negligent in losing Continental Bank's telex message and it can be argued that Swiss Bank should therefore be liable for a broader set of consequences than if it had only broken a contract. But *Siegel* implicitly rejects this distinction. Western Union had not merely broken its contract to deliver the plaintiff's money order; it had "negligently misdirected" the money order. "The company's negligence is conceded." 312 Ill.App. at 88, 91, 37 N.E.2d at 869, 871. Yet it was not liable for the consequences.

*Siegel*, we conclude, is authority for holding that Swiss Bank is not liable for the consequences of negligently failing to transfer Hyman-Michaels' funds to Banque de Paris; reason for such a holding is found in the animating principle of *Hadley v. Baxendale*, which is that the costs of the untoward consequence of a course of dealings should be borne by that party who was able to avert the consequence at least cost and failed to do so. In *Hadley* the untoward consequence was the shutting down of the mill. The carrier could have avoided it by delivering the engine shaft on time. But the mill owners, as the court noted, could have avoided it simply by having a spare shaft. 9 Ex. at 355–56, 156 Eng.Rep. at 151. Prudence required that they have a spare shaft anyway, since a replacement could not be obtained at once even if there was no undue delay in carting the broken shaft to and the replacement shaft from the manufacturer. The court refused to imply a duty on the part of the carrier to guarantee the mill owners against the consequences of their own lack of prudence, though of course if the parties had stipulated for such a guarantee the court would have enforced it. The notice requirement of *Hadley v. Baxendale* is designed to assure that such an improbable guarantee really is intended.

This case is much the same, though it arises in a tort rather than a contract set-

ting. Hyman-Michaels showed a lack of prudence throughout. It was imprudent for it to mail in Chicago a letter that unless received the next day in Geneva would put Hyman-Michaels in breach of a contract that was very profitable to it and that the other party to the contract had every interest in canceling. It was imprudent thereafter for Hyman-Michaels, having narrowly avoided cancellation and having (in the words of its appeal brief in this court) been "put ... on notice that the payment provision of the Charter would be strictly enforced thereafter," to wait till arguably the last day before payment was due to instruct its bank to transfer the necessary funds overseas. And it was imprudent in the last degree for Hyman-Michaels, when it received notice of cancellation on the last possible day payment was due, to fail to pull out all the stops to get payment to the Banque de Paris on that day, and instead to dither while Continental and Swiss Bank wasted five days looking for the lost telex message. Judging from the obvious reluctance with which the arbitration panel finally decided to allow the *Pandora*'s owner to cancel the charter, it might have made all the difference if Hyman-Michaels had gotten payment to the Banque de Paris by April 27 or even by Monday, April 30, rather than allowed things to slide until May 2.

This is not to condone the sloppy handling of incoming telex messages in Swiss Bank's foreign department. But Hyman-Michaels is a sophisticated business enterprise. It knew or should have known that even the Swiss are not infallible; that messages sometimes get lost or delayed in transit among three banks, two of them located 5000 miles apart, even when all the banks are using reasonable care; and that therefore it should take its own precautions against the consequences—best known to itself—of a mishap that might not be due to anyone's negligence.

We are not the first to remark the affinity between the rule of *Hadley v. Baxendale* and the doctrine, which is one of tort as

well as contract law and is a settled part of the common law of Illinois, of avoidable consequences. See Dobbs, Handbook on the Law of Remedies 831 (1973); cf. *Benton v. J. A. Fay & Co.*, 64 Ill. 417 (1872). If you are hurt in an automobile accident and unreasonably fail to seek medical treatment, the injurer, even if negligent, will not be held liable for the aggravation of the injury due to your own unreasonable behavior after the accident. See, e.g., *Slater v. Chicago Transit Auth.*, 5 Ill.App.2d 181, 185, 125 N.E.2d 289, 291 (1955). If in addition you failed to fasten your seat belt, you may be barred from collecting the tort damages that would have been prevented if you had done so. See, e.g., *Mount v. McClellan*, 91 Ill.App.2d 1, 5, 234 N.E.2d 329, 331 (1968). Hyman-Michaels' behavior in steering close to the wind prior to April 27 was like not fastening one's seat belt; its failure on April 27 to wire a duplicate payment immediately after disaster struck was like refusing to seek medical attention after a serious accident. The seat-belt cases show that the doctrine of avoidable consequences applies whether the tort victim acts imprudently before or after the tort is committed. See Prosser, Handbook of the Law of Torts 424 (4th ed. 1971). Hyman-Michaels did both.

█ The rule of *Hadley v. Baxendale* links up with tort concepts in another way. The rule is sometimes stated in the form that only foreseeable damages are recoverable in a breach of contract action. E.g., Restatement (Second) of Contracts § 351 (1979). So expressed, it corresponds to the tort principle that limits liability to the foreseeable consequence of the defendant's carelessness. See, e.g., *Neering v. Illinois Cent. R.R. Co.*, 383 Ill. 366, 380, 50 N.E.2d 497, 503 (1943). The amount of care that a person ought to take is a function of the probability and magnitude of the harm that may occur if he does not take care. See, e.g., *United States v. Carroll Towing Co.*, 159 F.2d 169, 173 (2d Cir. 1947); *Bezark v. Kostner Manor, Inc.*, 29 Ill.App.2d 106, 111–12, 172 N.E.2d 424, 426–27 (1961). If he

does not know what that probability and magnitude are, he cannot determine how much care to take. That would be Swiss Bank's dilemma if it were liable for consequential damages from failing to carry out payment orders in timely fashion. To estimate the extent of its probable liability in order to know how many and how elaborate fail-safe features to install in its telex rooms or how much insurance to buy against the inevitable failures, Swiss Bank would have to collect reams of information about firms that are not even its regular customers. It had no banking relationship with Hyman-Michaels. It did not know or have reason to know how at once precious and fragile Hyman-Michaels' contract with the *Pandora*'s owner was. These were circumstances too remote from Swiss Bank's practical range of knowledge to have affected its decisions as to who should man the telex machines in the foreign department or whether it should have more intelligent machines or should install more machines in the cable department, any more than the falling of a platform scale because a conductor jostled a passenger who was carrying fireworks was a prospect that could have influenced the amount of care taken by the Long Island Railroad. See *Palsgraf v. Long Island R.R.*, 248 N.Y. 339, 162 N.E. 99 (1928); cf. *Ney v. Yellow Cab Co.*, 2 Ill.2d 74, 80–84, 117 N.E.2d 74, 78–80 (1954).

In short, Swiss Bank was not required in the absence of a contractual undertaking to take precautions or insure against a harm that it could not measure but that was known with precision to Hyman-Michaels, which could by the exercise of common prudence have averted it completely. As Chief Judge Cardozo (the author of *Palsgraf*) remarked in discussing the application of *Hadley v. Baxendale* to the liability of telegraph companies for errors in transmission, "The sender can protect himself by insurance in one form or another if the risk of nondelivery or error appears to be too great. . . . The company, if it takes out insurance for itself, can do no more than

guess at the loss to be avoided." *Kerr S.S. Co. v. Radio Corp. of America*, 245 N.Y. 284, 291–92, 157 N.E. 140, 142 (1927).

But *Kerr* is a case from New York, not Illinois, and Hyman-Michaels argues that two early Illinois telegraph cases compel us to rule in its favor against Swiss Bank. *Postal Tel. Cable Co. v. Lathrop*, 131 Ill. 575, 23 N.E. 583 (1890), involved the garbled transmission of two telegrams from a coffee dealer—who as the telegraph company knew was engaged in buying and selling futures contracts—to his broker. The first telegram (there is no need to discuss the second) directed the broker to buy 1000 bags of August coffee for the dealer's account. This got changed in transmission to 2000 bags, and because the price fell the dealer sustained an extra loss for which he sued the telegraph company. The court held that the company had had notice enough to make it liable for consequential damages under the rule of *Hadley v. Baxendale*. It knew it was transmitting buy and sell orders in a fluctuating market and that a garbled transmission could result in large losses. There was no suggestion that the dealer should have taken his own precautions against such mistakes. In *Providence-Washington Ins. Co. v. Western Union Tel. Co.*, 247 Ill. 84, 93 N.E. 134 (1910), a telegram from an insurance company canceling a policy was misdirected, and before it turned up there was a fire and the insurance company was liable on the policy. This was the precise risk created by delay, it was obvious on the face of the telegram, and the telegraph company was therefore liable for the insurance company's loss on the policy. Again there was no suggestion that the plaintiff had neglected any precaution. Both cases are distinguishable from the present case: the defendants had more information and the plaintiffs were not imprudent.

The legal principles that we have said are applicable to this case were not applied below. Although the district judge's opinion is not entirely clear, he apparently thought the rule of *Hadley v. Baxendale* inapplicable and the imprudence of Hyman-Michaels irrelevant. See 522 F.Supp. at 833. He did state that the damages to Hyman-Michaels were foreseeable because "a major international bank" should know that a failure to act promptly on a telexed request to transfer funds could cause substantial damage; but *Siegel*—and for that matter *Lathrop* and *Providence-Washington*—make clear that that kind of general foreseeability, which is present in virtually every case, does not justify an award of consequential damages.

We could remand for new findings based on the proper legal standard, but it is unnecessary to do so. The undisputed facts, recited in this opinion, show as a matter of law that Hyman-Michaels is not entitled to recover consequential damages from Swiss Bank.

Since Hyman-Michaels' complaint against Swiss Bank must be dismissed, Swiss Bank's third-party complaint against Continental Bank and Continental Bank's cross-claim against Hyman-Michaels are moot. That leaves only Hyman-Michaels' counterclaim against Continental Bank still to be considered. Although it puts us in the peculiar position of deciding a case between two citizens of Illinois that involves only Illinois law, the counterclaim is within our ancillary jurisdiction. Continental Bank's complaint against Hyman-Michaels—a third-party defendant's complaint against the original plaintiff, arising out of the same transaction as the original suit, see Fed.R.Civ.P. 14(a)—is within that jurisdiction, *Mayer Paving & Asphalt Co. v. General Dynamics Corp.*, 486 F.2d 763, 772 (7th Cir. 1973), and Hyman-Michaels' counterclaim against Continental, being a compulsory counterclaim, did not require an independent federal jurisdictional basis and is therefore also within our ancillary jurisdiction.

█ █ It is true that if Hyman-Michaels' claim against Continental had been based

on Rule 14(a) rather than Rule 13(a), it would have required an independent federal jurisdictional basis. *Owen Equipment & Erection Co. v. Kroger*, 437 U.S. 365, 98 S.Ct. 2396, 57 L.Ed.2d 274 (1978). But there is no inconsistency. A plaintiff cannot confer federal jurisdiction to decide a state-law claim by asserting such a claim under Rule 14(a) against a third-party defendant who is a citizen of the same state, when if he had sued that party originally he would have had to bring his entire suit in state court because complete diversity would have been lacking. See 437 U.S. at 374–75, 98 S.Ct. at 2402–03. But so far as appears Hyman-Michaels did not want to sue Continental Bank originally; it was induced to do so by Continental's claim against it. That claim was within the ancillary jurisdiction of the federal courts because, like a compulsory counterclaim, it arose out of the same transaction as Hyman-Michaels' claim against Swiss Bank, which was indirectly a claim against Continental via Swiss Bank's indemnity claim against Continental. See *Revere Copper & Brass Inc. v. Aetna Cas. & Sur. Co.*, 426 F.2d 709, 716 (5th Cir. 1970). And Hyman-Michaels' claim against Continental, which *was* a compulsory counterclaim, did not require an independent jurisdictional basis. See *Moore v. New York Cotton Exch.*, 270 U.S. 593, 46 S.Ct. 367, 70 L.Ed. 750 (1926). Continental may not invoke the jurisdiction of the federal courts in order to bring a state-law claim against a nondiverse party and then use the lack of diversity to force that party to bring its identical claim against Continental in a state court.

■ On the merits, we agree with the district judge that Hyman-Michaels did not prove its case. Continental did not break any contract with Hyman-Michaels. All it undertook to do on April 25 was to transmit a telex message to Swiss Bank, and it did so. All it undertook to do on April 27, by the evidence of Hyman-Michaels' own confirming letter, was to advise its correspondent—that is, Swiss Bank—to "persist in attempting to make . . . payment," and it did so advise its correspondent. Nor was Continental negligent on either occasion. Its telex operator had used the machine in Swiss Bank's foreign department before, for the same purpose and without incident; he had no reason to expect a mishap. And Continental used due care in assisting Swiss Bank in the latter's vain hunt for the missing telex. The district court's findings on these issues were skimpy but the facts are clear and a remand is unnecessary.

No other issues need be decided. The judgment in favor of Hyman-Michaels against Swiss Bank is reversed with directions to enter judgment for Swiss Bank. The judgment in favor of Continental Bank on Swiss Bank's third-party complaint is vacated with instructions to dismiss that complaint as moot. The judgment dismissing Continental's cross-claim against Hyman-Michaels as moot, and the judgment in favor of Continental on Hyman-Michaels' counterclaim, are affirmed. The costs of the appeals shall be borne by Hyman-Michaels (EVRA Corporation).

SO ORDERED.