**DIVERSIFIED TECHNOLOGIES CORPORATION, Plaintiff,**

**v.**

**JEROME TECHNOLOGIES, INC., Defendant.**

**No. 87 C 6128.**

United States District Court,
N.D. Illinois, E.D.

Jan. 28, 1988.

Robert A. Downing, Eugene A. Schoon, Alan F. Curley, Sidley & Austin, Chicago, Ill., William M. Dunkley, Dunkley, Bennett & Christensen, Minneapolis, Minn., for defendant.

Earle S. Rappaport, Donald F. Engel, Schwartz, Cooper, Kolb & Gaynor, Chartered, Chicago, Ill., for plaintiff.

## MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

Diversified Technologies Corporation ("Ditco") has sued Jerome Technologies, Inc. ("Jerome") for breach of contract: Jerome allegedly failed to pay Ditco for services rendered toward the "Project"—the proposed development of a new type of lid for beverage cans, the "AM–TAB Easy Open Beverage End" (the "AM–TAB"). Ditco's one-count complaint sought a de-

claratory judgment that (1) its agreements with Jerome were terminated and (2) Diversified "is vested with the entire right, title and interest in and to the Project...." On Jerome's motion this Court's October 13, 1987 oral ruling (the "Ruling") struck Ditco's effort to gain ownership of the Project.[1]

Jerome's contention and the Ruling accepting it have predictably led to Jerome's current motion for sanctions under Rule 11. What was far less predictable was the nature of the sanctions sought by Jerome: not only the standard request for attorney's fees and expenses but also an attempt to recover Jerome's consequential losses stemming from Ditco's improper prayer for relief. For the reasons stated in this memorandum opinion and order, Jerome's motion is granted in part and denied in part—although (as explained hereafter) the partial denial is without prejudice to a possible future reassertion of the claim.

### Facts [2]

Jerome is engaged in the development of the AM–TAB. It has developed certain technological and proprietary information and at least one patent.

On March 18, 1986 Jerome entered into two agreements (collectively the "Agreements") for Ditco's assistance in developing the AM–TAB for commercial use: an Agreement for Engineering Services (the "Engineering Agreement," Complaint Ex. A) and a Non-Disclosure Agreement (the "Non-Disclosure Agreement," Complaint Ex. B). To date Jerome has paid Ditco approximately $60,000 for services under the Engineering Agreement, but another $123,554.90 that Ditco says is owing for additional services it rendered remains unpaid (Complaint ¶ 9).

On July 10, 1987 Ditco filed the present diversity action based on the asserted non-payment. But Ditco did not ask for payment. Instead it sought to take over the Project lock, stock and barrel, not only asserting the claims described in the first paragraph of this opinion but also seeking confirmation that it could use or disclose information about the AM–TAB for its sole benefit.

This Court's Ruling held that (1) Ditco had expressly bargained for monetary rights against Jerome (Complaint Ex. A ¶¶ 3, 4) and (2) both the Engineering Agreement and the Non-Disclosure Agreement established that all information and intellectual property concerning the Project would belong to Jerome and not to Ditco (Complaint Ex. A ¶ 7 and Ex. B). In the course of the Ruling this Court rejected Ditco's arguments as to the inadequacy of legal remedies for the claimed breach of contract, finding that Jerome's asserted inability to satisfy any award of money damages did not validate Ditco's efforts to seek the forfeiture of all Jerome's rights to the Project.[3] On October 27, 1987 Ditco amended its complaint to seek monetary damages from Jerome.

When Ditco filed this action Jerome was well along in the processing of an initial public offering of its stock to finance development of the AM–TAB, and it was also pursuing licensing agreements for the product in the beverage industry. Jerome had secured a letter of intent from Professional Brokerage Services, Inc. ("PBS") of New York to underwrite the offering. Jerome asserts Ditco was aware of the

---

**1.** Jerome had also sought to dismiss the Complaint itself under Fed.R.Civ.P. ("Rule") 12(b)(6) or, alternatively, to strike Complaint ¶ 13, which alleges the existence of an actual controversy over whether the agreements between the parties are terminated and whether the rights to the Project are vested in Ditco. This Court denied the motion to dismiss because, on the strength of the Complaint's well-pleaded factual allegations (*Marmon Group, Inc. v. Rexnord*, 822 F.2d 31, 34 (7th Cir.1987) (per curiam)), Ditco would certainly be entitled to damages (though not to the very different relief it prayed for). That clearly satisfies the standard of *Conley v. Gib-*

*son*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–102, 2 L.Ed.2d 80 (1957), because a cause of action is judged by the effect of its factual allegations and not by the prayer for relief.

**2.** For current purposes Ditco's version of the parties' dispute must be accepted. Accordingly the text summary is drawn from the Complaint in that respect, but it goes on from there to deal with Jerome's version of the events bearing on its claimed Rule 11 damages.

**3.** This opinion later elaborates on the untenability of Ditco's original prayer for relief.

planned offering and was told that adverse claims of ownership to the AM–TAB would jeopardize the offering (attaching a May 29, 1987 letter, Jeffrey Landa ("Landa") Aff. Ex. B, from Jerome's counsel to Ditco's counsel). Jerome now maintains Ditco's improper claim of rights to the Project caused PBS to withdraw its underwriting commitment. Jerome has also been unable to execute any licensing agreements for the AM–TAB.

### Rule 11 Standards

■ As amended in 1983, Rule 11 imposes several threshold requirements before any document is filed in a federal court. *Szabo Food Service, Inc. v. Canteen Corp.*, 823 F.2d 1073, 1080 (7th Cir. 1987) has identified four separate components of the Rule:

> There must be "reasonable inquiry" into both fact and law; there must be good faith (that is, the paper may not be interposed "to harass"); the legal theory must be objectively "warranted by existing law or a good faith argument" for the modification of existing law; and the lawyer must believe the complaint is "well grounded in fact."

Rule 11 operates under an objective standard—an attorney's [4] argument and belief must be reasonable under the circumstances of the case (*Brown v. Federation of State Medical Boards of United States*, 830 F.2d 1429, 1435 (7th Cir.1987)). Subjective good faith is no longer a valid defense to charges of having transgressed Rule 11's proscriptions (*Thornton v. Wahl*, 787 F.2d 1151, 1154 (7th Cir.1986); *Engh v. United States*, 658 F.Supp. 698, 703 (N.D. Ill.1987)).

■ It is of course important that Rule 11 not be used "to chill an attorney's enthusiasm or creativity in pursuing factual or legal theories" (Advisory Committee Notes; see also *Brown*, 830 F.2d at 1437). Its operation must leave play in the joints of our legal system for the continuing evolution of the law (see Note, *Plausible Pleadings: Developing Standards for Rule 11 Sanctions*, 100 Harv.L.Rev. 630 (1987)). Thus where an argument has a colorable basis under existing law or for an extension or modification of existing law, it will not be sanctionable. Relatedly, the outcome of a motion addressed to the merits of a claim or an argument should not necessarily be dispositive as to whether that claim was frivolous ex ante (see *Zaldivar v. City of Los Angeles*, 780 F.2d 823, 830–31 (9th Cir.1986)).

Once a violation is found, however, Rule 11 mandates the court's imposition of some sanction (*Frantz v. United States Powerlifting Federation*, 836 F.2d 1063, 1064–1065 (7th Cir.1987)). As the rule puts it, the court:

> shall impose ... an appropriate sanction, which may include an order to pay to the other party or parties the amount of the reasonable expenses incurred because of the filing of the pleading, motion, or other paper, including a reasonable attorney's fee.

That gives the District Court considerable discretion in choosing a sanction (*Frantz*, at 1066).

All this forms the backdrop for a double inquiry here. At the outset this Court must decide whether Ditco's original prayer for relief was a sanctionable filing. If that gets an affirmative answer, it becomes necessary to examine the propriety of the sanctions Jerome seeks.

### Ditco's Prayer for Relief

■ Unquestionably Ditco's Complaint states a valid breach of contract claim. But that is not the focus of Jerome's motion. Instead it urges the objective unreasonableness of the choice made by Ditco— through its attorneys—to pursue a takeover of the Project via forfeiture, rather than simply seeking payment for its services.

---

**4.** As Rule 11 reflects, its provisions apply to anyone who signs a filed document, whether lawyer or litigant (for an instance of the Rule's application to a nonlawyer, see *Snyder v. IRS*, 596 F.Supp. 240, 251–52 (N.D.Ind.1984)). This opinion speaks only of the "attorney's" duty under Rule 11 because the Complaint here was signed by Ditco's counsel and not by one of its principals.

Rule 11 applies to Ditco's prayer for relief. Our Court of Appeals has not addressed that precise question, though *Frantz*, at 1067 does say that "Rule 11 applies to all statements in papers it covers." However, the Ninth Circuit has specifically held Rule 11 can reach the relief a party requests in its complaint (*Hudson v. Moore Business Forms, Inc.*, 827 F.2d 450, 456 (9th Cir.1987)):

> We therefore conclude that nothing in Rule 11 precludes us from making an independent analysis of the prayer for relief to determine whether it is frivolous and brought for an improper purpose.

As with any other component of a pleading, the frivolousness of a prayer may stem from failure to make a reasonable inquiry either into the facts of the case or into the applicable law (*Brown*, 830 F.2d at 1435). Jerome attacks and succeeds on both counts.

Here the factual investigation was a simple task indeed.[5] Instead of the usual burdens encountered by lawyers consulted by clients who present them with undifferentiated (and often complex) factual scenarios, in this instance Ditco's attorney had only to resort to the specific terms of the Agreements:

1. As might have been expected, the Engineering Agreement called for payment—and prompt payment—by Jerome of the bills tendered by Ditco. Engineering Agreement ¶ 3(h) specified a single consequence of nonpayment:

> In the event that invoices are not paid by JTI [Jerome] within 30 days, a one and one-half percent interest charge per month may be charged.

Engineering Agreement ¶ 4 went on to provide that Ditco's right to any fees, costs or expenses would survive termination of that Agreement.

2. Nothing in either Agreement even hinted at any proprietary interest in the Project inuring to Ditco by reason of its services. In fact, just the opposite was true: Ditco agreed, both in Engineering Agreement ¶ 10 and in the Non-Disclosure Agreement, to hold technical and other information from Jerome in confidence. Such information was not to be used or disclosed by Ditco without Jerome's consent either during the life of the Engineering Agreement *or after its termination.*[6]

3. In addition to the Agreements' provisions negating Ditco's ability to take advantage of Jerome's knowledge of the Project, the Engineering Agreement also made sure that even the results of Ditco's own efforts would not become its property, but Jerome's. Engineering Agreement ¶ 7 specifically vested in Jerome the right to anything developed by Ditco:

> Ditco agrees to and hereby does assign to JTI [Jerome], without further consideration, the entire right, title and interest in and to all inventions, improvements, discoveries and intellectual property....

Jerome also submitted as Exhibit A to its Motion To Dismiss an "Assignment of Invention" executed by the parties on July 31, 1986—and of course any reasonable factual investigation would have revealed its existence to Ditco's counsel as well.

In sum, both the express provisions of, and all the reasonable negative implications from, the Agreements confirm Jerome's total ownership of the Project, whether stemming from Jerome's efforts or Ditco's. And of course the same facts establish Ditco's total lack of ownership plus the absence of any arrangements for its acquiring such ownership.

---

**5.** This statement is limited to the investigation called for in shaping the prayer for relief. It does not at all address what may have been needed (and done) in the total investigation involved in bringing suit, a matter to which Ditco's responsive memorandum mistakenly devotes its total attention without examining the *relevant* inquiry.

**6.** Engineering Agreement ¶ 4 provided the arrangement could be terminated by either party upon written notice. Jerome's Motion To Dismiss 7 pointed out Ditco has yet to allege it ever gave any notice of termination (other than by suing for termination).

Against that backdrop, Ditco has really tendered nothing in existing law to support its claim to take over that ownership and oust Jerome entirely because of an unpaid bill for services. It scarcely seems necessary to repeat the familiar equitable maxim that equity abhors a forfeiture (see, e.g., *Ambassador Foods Corp. v. Montgomery Ward & Co.*, 43 Ill.App.2d 100, 107, 192 N.E.2d 572, 576–77 (1st Dist.1963)). As Jerome R. Mem. 4 notes, Ditco has not even alleged that the value of the rights it seeks to obtain bore any relation to the sum claimed from Jerome.

Indeed, even if it were asserted that the unpaid contractual amount equaled or exceeded the value of the Project, Ditco has still not advanced the essential predicate for equitable relief—the inadequacy of its legal remedies against Jerome (see, e.g., *Scott & Fetzer Co. v. Montgomery Ward & Co.*, 129 Ill.App.3d 1011, 1021–22, 85 Ill.Dec. 53, 61, 473 N.E.2d 421, 429 (1st Dist.1984)). Ditco's fear that Jerome's financial condition would render a judgment for damages meaningless, even if justified, does not speak to such inadequacy in the legal sense. As this Court said in ruling on Jerome's original motion (Tr. 3):

> If [Ditco] establishes its right to get paid, and if Jerome can't make good, the remedies available to it are such things as attachment or levy or perhaps even a bankruptcy proceeding. What [Ditco] is really seeking to do here is to disrupt the orderly procedures of law by an attempt to forfeit Jerome's property, and in a sense steal a march on other creditors.

Ditco's responsive arguments are really empty. Even a brief review demonstrates the too-often-encountered phenomenon that vigorous (and even biting) rhetoric cannot effectively mask the weakness of a legal position.

First, Ditco Mem. 3 urges the existence of a genuine belief that the prayer for relief was warranted by existing law. But again the test is one of objective reasonableness, not subjective good faith. For Rule 11 purposes the "pure heart, empty head" defense ended with the 1983 amendments (*National Union Fire Insurance Co. of Pittsburgh v. Continental Illinois Corp.*, 116 F.R.D. 252, 255 (N.D.Ill.1987)).

Next, Ditco Mem. 3–5 recounts at some length counsel's factual inquiry before filing the Complaint. That may well show factual support for suing Jerome for breach of contract (that is, as to the merits of Ditco's substantive claim), but it is irrelevant as to any factual support for the claimed right to a forfeiture of the Project. Nowhere does Ditco set forth a factual predicate for its original prayer for relief.

Nor do the legal authorities Ditco cites offer any basis for the relief originally requested. *Roland Machinery Co. v. Dresser Industries, Inc.*, 749 F.2d 380 (7th Cir.1984) involved a preliminary injunction sought by a dealer to prevent the termination of its dealership relationship with a manufacturer. In that situation the court found the defendant's potential bankruptcy, which might intervene before a final judgment in damages could be obtained and collected, might perhaps justify an injunction to freeze the status quo (*id.* at 386). Thus the equity court lent its good offices to facilitate the ultimate collection of the money owed—no more. The availability of that kind of interim relief provides no warrant for the dramatically different permanent alteration of vested property rights—outright forfeiture—out of fear that a defendant would be unable to satisfy a money judgment.

*Pratt v. Weeks*, 1 F.Supp. 953 (S.D.Fla. 1932) is of no greater help. There plaintiff obtained rescission of a contract plus restitution, in part because a defendant was insolvent and had previously benefited from plaintiff's performance (*id.* at 957). Although the court allowed an equitable lien to secure the restitution, once again Ditco's counsel—one of the leading Chicago firms in the field of creditors' rights and bankruptcy—knows all too well the sharp difference between obtaining a dollar-limited secured position and obtaining outright ownership of property via judicial proceedings.

Finally, Ditco asserts a specious contention as to the availability of declaratory relief. It is true but irrelevant that, as

Ditco Mem. 6 says, litigants can seek declaratory judgments despite the existence of other adequate remedies (see Rule 57). What a litigant cannot do is to legitimize a frivolous complaint for forfeiture by attaching the label "declaratory judgment" to it. Ditco's request was frivolous not because the existence of legal remedies precluded declaratory relief as such, but rather because the declaration of rights it sought was doomed to fail.

It is thus plain that the Complaint's prayer for relief is sanctionable for lack of existing legal support. To complete the analysis this Court must also consider whether Ditco has made an objectively reasonable argument for the modification or extension of existing law (see *Szabo Food,* 823 F.2d at 1081–82). At the outset of that inquiry it should be noted that Ditco's response to Jerome's motion to dismiss or strike the prayer for relief never claimed it was arguing for a modification of existing precedent.[7] And post-hoc rationalizations will not do the job—as *In re Ronco,* 838 F.2d 212, 218 (7th Cir.1988) has just said (emphasis in original):

> This court, however, has required that the party against whom sanctions would be imposed must actually make the reasonable argument, not merely assert after-the-fact that a reasonable argument *could* have been made (even if the party didn't make it).

That means the litigant must acknowledge the precedent against its position and then assert the basis for a modification of that existing precedent (see, e.g., *In re Central Ice Cream Co.,* 836 F.2d 1068, 1073 (7th Cir.1987) and cases cited there).

All this is really academic, though. Even now Ditco's attorneys have tendered no argument for how or why existing precedent should be altered. Ditco Mem. 6 says only that if its cited authorities don't make

the grade under existing law, "those authorities clearly rise to a level sufficient to firmly anchor a good faith argument for the extension of existing law." But as *Eastway Construction Corp. v. City of New York,* 762 F.2d 243, 254 (2d Cir.1985) has said:

> [W]here it is patently clear that a claim has absolutely no chance of success under the existing precedents, and where no reasonable argument can be advanced to extend, modify or reverse the law as it stands, Rule 11 has been violated.

In summary, Ditco has not satisfied Rule 11. It has not shown any reasonable basis for its prayer for relief, either by existing precedent or by an arguably colorable modification of existing law. Accordingly this opinion now turns to the question of an "appropriate sanction" within the meaning of the Rule.

### Appropriate Sanctions

■ In part Jerome's request is the one most often encountered under (and the only one specifically mentioned in) Rule 11: its attorney's fees (plus any expenses) in responding to Ditco's original prayer for relief. This Court need not dally over that request. Whatever view is taken of Rule 11's purpose and jurisprudential role (a matter soon to be discussed in some detail), that specific area of "but-for" expense that Ditco thrust on Jerome without any real justification ought to be recouped by Jerome.

■ What is far more problematic—indeed unique from what this Court has been able to unearth—is Jerome's effort to collect its consequential losses allegedly caused by the frivolous aspects of Ditco's original Complaint—items flowing from the loss of Jerome's underwriter PBS as the

---

7. Indeed, there is serious doubt whether such an argument could have been made. Because jurisdiction here rests on diversity, this Court must look to state law—in this instance, the substantive law of Illinois because the parties have not contended otherwise (see *National Ass'n of Sporting Goods Wholesalers, Inc. v. F.T.L. Marketing Corp.,* 779 F.2d 1281, 1284–85 (7th Cir. 1985)). Our Court of Appeals consistently re-

minds us that arguments for such major modifications of Illinois common law remedies in a contract action should be addressed, in the first instance, to an Illinois state court (see *Gust K. Newberg Construction Co. v. E.H. Crump & Co.,* 818 F.2d 1363, 1368 (7th Cir.1987); *Shaw v. Republic Drill Corp.,* 810 F.2d 149, 150 (7th Cir.1987) (per curiam)).

result of Ditco's assertion of its right to the AM–TAB.[8] Whether Rule 11 is available to compensate Jerome for any such losses qualifies as an issue of first impression. Jerome has candidly admitted uncovering no cases that have awarded sanctions of this nature. For its part Ditco has completely ignored this Court's plain request for briefing on that legal issue.[9] This Court has been left to wrestle with the problem pretty much on its own.

What neither litigant has identified is the fundamental difference—one of kind, not of degree—between the claim now under consideration and the conventional one for attorney's fees specified in Rule 11. As already pointed out, the measure of attorney's fees as sanctions is the services the imposed-upon counsel would not have been required to render *but for* the sanctionable conduct—the proximate result of that conduct. Though this Court has been able to locate only one case in which what *might* be viewed as consequential damages were recovered as a result of a Rule 11 violation,[10] those added damages also had the same proximate-result relationship to the rule-violative conduct. Following a frivolous removal of a state court action that delayed entry of judgment on a jury verdict, *Davis v. Veslan Enterprises*, 765 F.2d 494, 500–01 (5th Cir.1985) upheld sanctions in the form of interest from the date judgment would have been entered in the absence of the removal—plainly a compensatory award in the classic but-for sense.

But here, by contrast with the usual attorney's fees award and with *Davis* as well, the offering-related expenses were incurred by Jerome voluntarily and wholly without relation to the later sanctionable filing. Not only was the proposed offering undertaken well before this action was brought, but it is obvious that most (if not all) of the claimed $170,000 plus in offering-related expenses were committed before the institution of this action too. What Jerome complains of is not that it had to spend the money *because* of the tainted filing, but rather that the already undertaken expenditures came to naught by reason of Ditco's Rule 11 violation. From this analysis it is clear that what is at issue is a straight damages claim, very different from anything that has been approved by the courts up to now.

If a strict ejusdem generis approach were taken to construing Rule 11, then, Jerome would certainly fail. Its claimed losses are not at all of the same genus, let alone the same species, as attorney's fees —the only sanction specifically mentioned

---

8. In principal part Jerome Mem. 7–8 asks to be compensated for its out-of-pocket expenses from the aborted public offering (see Jerome Mem. 7–8)—over $170,000 in legal fees, consulting fees and printing costs (Landa Aff. ¶ 9). At other points Jerome also appears to be asking for far more speculative and certainly unquantified damages—the lost proceeds of the offering and the lost profits from any licensing agreements (Jerome Mem. 6). This opinion will focus on the already-realized out-of-pocket expenses, which face trouble enough without the added difficulties the other claims would encounter.

9. Ditco Mem. 1 states this Court's charge to the litigants accurately enough:

Ditco's Response should focus on the legal issues involved in JTI's Motion. Presumably, in the event the court does not dispose of the Motion on Ditco's Response and JTI's Reply thereto, the court will schedule further briefing on any remaining factual issues.

What this Court had told counsel was to eschew any consideration of matters that were second-stage issues and might involve factual disputes

(the amount of fees claimed by Jerome was the most obvious example of that). But this Court was careful to identify up front what was likely to be the most difficult question involving the least available prior authority of any kind—the issue about to be discussed. Under those circumstances Ditco's total silence is unexplainable. It has forced what should be the lawyers' work (at least in the first instance) on this Court's law clerk and this Court itself—and unfortunately there is no judicial counterpart of Rule 11 to permit recoupment of the effort expended on that shifted burden.

10. Some courts have also imposed fines on the Rule 11 violator. By definition payable to the Clerk of Court rather than to the opposing party, such fines are designed to compensate the court for wasted judicial resources as well as to provide additional deterrence against the frivolous filing (see, e.g., *Snyder*, 596 F.Supp. at 252). Our Court of Appeals has also said the measure of sanctions need not be identical to the attorney's fees incurred, again referring to the possibility of such a fine (see *Frantz*, at 1065). But nothing in that discussion even hinted at the kind of recovery sought here.

in the Rule. But that approach would prove too much. After all that analogy would bar the imposition of fines as well, and (as n. 10 reflects) fines are an accepted type of Rule 11 sanction. Moreover, a one-item listing in Rule 11 of permissible sanctions following the word "including" (the item of attorney's fees) is certainly an odd candidate for ejusdem generis analysis. Even in spatial geometry it takes two points to define a line and three points to define a plane.[11] Accordingly it becomes necessary to look elsewhere than just the language of Rule 11 to obtain an informed answer.

Rule 11 jurisprudence offers little guidance. All the Advisory Committee Notes say about the "appropriate sanction" is this:

> The court ... retains the necessary flexibility to deal appropriately with violations of the rule. It has discretion to tailor sanctions to the particular facts of the case, with which it should be well acquainted.

As for whatever clues may be drawn from the Rule's underlying rationale, that search is complicated by the well-recognized existence of two competing versions of the Rule's purpose: to compensate the aggrieved party or to deter future violations through punishing the transgressor (see Nelken, *Sanctions Under Amended Federal Rule 11—Some "Chilling" Problems in the Struggle Between Compensation and Punishment*, 74 Geo.L.J. 1313, 1323–25 (1986)). Of course it is an inaccurate oversimplification to speak of the Rule's "purpose" in the singular. Surely Rule 11 can serve more than one purpose, with the question being one of emphasis rather than mutual exclusivity. Even so, an examination of both the just-described purposes should be undertaken in the effort to see whether a particular sanction is "appropriate."

Compensation as a rationale (primarily associated with Professor Arthur Miller, Reporter to the Advisory Committee on Civil Rules of the Judicial Conference of the United States and the amended Rule's principal draftsman) emphasizes the expense-shifting goal of Rule 11 sanctions. Under that approach the party that violates the Rule should bear the cost of that violation (see Miller, *The August 1983 Amendments to the Federal Rules of Civil Procedure* (Federal Judicial Center 1984) 17).[12]

On the other side is the deterrence view of sanctions exemplified by another articulate spokesman, Judge William Schwarzer. In his article *Sanctions Under the New Federal Rule 11—A Closer Look*, 104 F.R.D. 181, 185 (1985) Judge Schwarzer emphasizes the punitive aspect of sanctions:

> The rule provides for sanctions, not fee shifting. It is aimed at deterring and, if necessary, punishing improper conduct rather than merely compensating the prevailing party.

In appropriate cases, sanctions may exceed the prevailing party's out-of-pocket expenses where necessary to deter (see *Frantz*, at 1065). However, Judge Schwarzer's article (echoing the case law) goes on to say (104 F.R.D. at 201) that the least severe sanction adequate to deter should be imposed.

Any regular reader of our own Court of Appeals' decisions in the area must recognize the somewhat mixed signals it has conveyed—with different opinions endorsing the differing views of Rule 11 sanctions. It is not too much to say that defining the "court's" view (as contrasted with the views of its individual members) is not

---

**11.** This is not at all a fanciful analogy. Ejusdem generis depends on comparing the challenged item with the category defined by the enumerated items. When several enumerated items are involved, their common characteristic(s) define(s) the classification, so that an effective comparison can be made—something like the process of deciding the ratio decidendi described in Levi, *An Introduction to Legal Reasoning*. Obviously the smaller the number of enumerated items, the less sharply defined the classification becomes. And with only one specified item, the process may resemble the art of divination from birds' entrails.

**12.** In those terms the fee-shifting sanction is seen as yet another exception to the American Rule, under which litigants' legal expenses normally rest where they originally fall (see *Brown*, 830 F.2d at 1437–38).

really feasible. For example, *Brown*, 830 F.2d at 1437–38 sees compensation as "one thrust" of the Rule, with deterrence being an even more important purpose. On the other hand, for example, *In re Ronco* at least seems to look primarily in the other direction, speaking of "recoupment" as the focus.[13] On occasion the court has emphasized the District Court's discretion in fashioning the appropriate sanction (*Frantz*, at 1067) and that considerations of equity are relevant (*Brown*, 830 F.2d at 1439). In that respect *Brown, id.* at 1437 has also endorsed Judge Schwarzer's view (and that of other courts) that the least severe sanction that is adequate should be imposed.

This Court need not now resolve just what stance Rule 11 calls for in general terms. To be sure, if Jerome's factual assertions as to its consequential losses are assumed accurate,[14] Jerome will not be fully compensated for the losses flowing from Ditco's improper filing without recouping its expenses beyond its attorney fees and related items. Those far greater losses were those related to the derailed offering, not just the excess expenses incurred in the judicial arena. But recovery of those losses via Rule 11 is sufficiently outside the already-charted judicial seas (on either view of Rule 11's function) to require denial of such relief, at least for now.

That conclusion is fortified by other aspects of the case now pending before this Court. Jerome has asserted counterclaims against Ditco for breach of contract and tortious interference with reasonably anticipated business expectations.[15] Those claims will require proof of critical facts essential to the now-denied Rule 11 claim—

perhaps most importantly, the causal nexus between Ditco's litigation tactics here and the frustration of Jerome's offering (see n. 14). If Jerome were to lose on that issue, it could not recover those losses under Rule 11 either, and the more difficult legal questions suggested by this opinion would be rendered moot. Moreover, a deferred motion under Rule 11, tendered anew if Jerome is successful in proving causation, would have the benefit of whatever added Rule 11 jurisprudence may have developed in the interim on the question of "appropriate sanctions."

Indeed, this Court's current resolution of the issue avoids other knotty problems that would be posed by a current premature satellite litigation limited to the Rule 11 claim alone (as to the problems posed by such satellite procedures see, e.g., Judge Cudahy's separate opinion in *Szabo Food Service*, 823 F.2d at 1085–86 and the Advisory Committee Notes on that subject). Jerome's Rule 11 claim, like its counterclaim, would appear to rest on *Hadley v. Baxendale* foreseeability considerations (see *Evra Corp. v. Swiss Bank Corp.*, 673 F.2d 951, 955–56 (7th Cir.1982), applying Illinois law). Any such determination is much better made in the context of full factual development, following any necessary discovery, and that in turn would be better arrived at through an orderly litigation of the counterclaim rather than any early Rule 11 hearing. And of course it cannot be overlooked that if Jerome *wins* on the counterclaim itself (not just on the causation issue), the Rule 11 claim for the same losses would be mooted.

---

**13.** There the court said (at 218):
The impact on the court and on the opposing party occurs when the initial omission is made. Later correction does not permit a recoupment of the time, energy or, in some cases, money that has already been expended.

**14.** This Court instructed the parties to limit their present filings on the Rule 11 motion to the legal issues involved, rather than exploring the factual issues related to Jerome's claim. Thus no basis exists for ruling on the validity of those claims. It is worth noting, however, that the May 29, 1987 letter from Jerome's counsel to Ditco's identified the filing of a lawsuit alone,

and not a claim of ownership of the AM–TAB, as posing a threat to the offering. And it will be recalled that no Rule 11 violation was involved in Ditco's bringing this action as such. At a minimum that casts doubt on Jerome's ability to deliver as advertised in its motion in terms of the proximate-cause relationship between the Rule 11 violation and the claimed consequential damages.

**15.** Jerome also counterclaims for injunctive relief, seeking to enjoin Ditco from using or disclosing any information disclosed by Jerome or developed by Ditco under the Agreements.

It is true that the counterclaim and Rule 11 alternatives may impose different evidentiary burdens on Jerome. Its tortious interference claim would likely require Ditco to have interrupted Jerome's business plans intentionally (see Prosser and Keeton, *Law of Torts* § 130, at 1008–12 (5th ed. 1984)), while Rule 11 simply requires Ditco to have been objectively unreasonable rather than intentionally malicious (see *Eastway Construction*, 762 F.2d at 253–54). However, that consideration calls only for the exercise of some ingenuity (taking into account, for example, which questions will be submitted for this Court's determination and which (if any) for a jury's). That and any other procedural matters may readily be left for the future.

### Conclusion

This Court therefore resolves Jerome's current motion this way:

1. Jerome shall be awarded its attorney's fees and expenses incurred by reason of bringing (a) its motion to dismiss or strike and (b) its consequent motion for Rule 11 sanctions. Jerome has already submitted the Landa affidavit as to those matters. Ditco is granted until February 18, 1988 to assert any challenges to Jerome's calculation of reasonable fees and costs.[16]

2. Because the sanction is a function of the prayer for relief, the propriety of which is peculiarly within the ken of lawyers, and because the offending Complaint was signed by counsel (which Rule 11 defines as the necessary condition for imposition of sanctions), Ditco's law firm is responsible for payment of the sanctions.[17] At least for the time being, counsel are not to pass any part or all of that cost on to Ditco.[18]

3. Jerome's remaining sanctions claim is rejected for the present.

This action is set for a status hearing March 2, 1988 at 9 a.m. to discuss the still open sanction-related items and the parties' general future plans for the litigation.

---

**16.** To minimize (or obviate entirely) any evidentiary hearing on the subject, with its inevitable pyramiding of fees on fees, counsel for the parties are encouraged to confer in the interim.

**17.** Though this District Court's General Rule 3.14(c) indicates otherwise (it prohibits appearances by firm name rather than by individual attorneys), the pleading was signed in the law firm name. That eliminates any need to decide whether an individual lawyer's signature may create exposure for his or her partners (see, e.g., *Calloway v. Marvel Entertainment Group*, 650 F.Supp. 684, 686–87 (S.D.N.Y.1986); cf. this Court's opinion in *Northern Trust Co. v. Muller*, 616 F.Supp. 788, 789 (N.D.Ill.1985)).

**18.** Judge Schwarzer's article notes (104 F.R.D. at 203):

Where ... the violation may reflect deliberate litigation strategy, at least some part of the sanctions can fairly be imposed on the client although the client's instructions do not absolve the attorney from professional accountability for carrying them out. That at least appears to assume the client as well as the lawyer has signed the sanctionable pleading (if not, Rule 11 does not literally permit sanctioning the client). And because Ditco has not signed the Complaint here, the problem of lawyer reimbursement or nonreimbursement by Ditco might implicate invasion of the lawyer-client privilege. This too is an issue for possible future resolution.