Wolf Siegel, Appellant, v. Western Union Telegraph Company, Appellee.

Gen. No. 41,139.

Heard in the second division of this court for the first district at the February term, 1940. Opinion filed November 28, 1941. Rehearing denied December 10, 1941.

HARRY A. SILVERSTEIN, of Chicago, for appellant; BEN COPPLE and MEYER SILVERSTEIN, both of Chicago, of counsel.

WEST & ECKHART, of Chicago, and FRANCIS R. STARK, General Solicitor, for appellee; OWEN A. WEST and PAUL HASSELL, both of Chicago, of counsel.

MR. JUSTICE FRIEND delivered the opinion of the court.

Plaintiff brought suit against the Western Union Telegraph Company for damages resulting from its failure to transmit promptly a telegraphic money or-

der. The court limited his damages to the charge made for transmitting the money order and entered judgment accordingly for $1.92. Upon the theory that he had established damages in excess of $500, the maximum sum provided in the tariff regulation then on file with the Federal Communications Commission, plaintiff seeks reversal of the judgment and the entry of judgment here in the sum of $500 and costs.

The cause was submitted and tried by the court upon stipulated facts. It appears that on November 23, 1938, plaintiff delivered to the Western Union Telegraph Company $200 with instructions to transmit this sum to P. W. Gunkel, a friend of plaintiff residing at Rogers Smith Hotel in Washington, D. C. The money was to be wagered on a horse named Mintson, to win, at the pari mutuel machines at Bowie Race Track in Maryland, where pari mutuel wagering is legalized under the laws of that State. The money order was negligently misdirected to New York City and was ultimately delivered to Gunkel several hours after the race had been run November 24, 1938. Mintson won and the pari mutuel machines paid $18.50 for each $2 wagered. Had plaintiff's $200 been placed the odds would have been reduced to $16.50. Deducting the principal of the money order which was returned to plaintiff he claims to have sustained damages to the extent of $1,450 through defendant's negligence.

The suit is predicated on a tariff regulation then in effect and on file with the Federal Communications Commission, which also appears as one of the conditions set forth on the back of the money order application, providing: "In any event, the Company shall not be liable for damages for delay, nonpayment or underpayment of this money order, whether by reason of negligence on the part of its agents or servants or otherwise, beyond the sum of $500, at which amount the right to have this money order promptly and correctly transmitted and promptly and fully paid is

hereby valued, unless a greater value is stated in writing on the face of this application and an additional sum paid or agreed to be paid based on such value equal to one-tenth of one per cent thereof.''

Prior to 1910 telegraph companies had a common-law liability from which they might or might not extricate themselves according to views of policy prevailing in the several States. (*Western Union Telegraph Co. v. Esteve Bros. & Co.*, 256 U. S. 566 (1921).) In June of that year Congress broadened the scope of the act to regulate commerce so as to include telegraph, telephone and cable companies engaged in sending messages interstate and to any foreign country. (Chapter 309, sec. 7, 36 Stat. at L. 539.) · This act ''introduced a new principle into the legal relations of the telegraph companies with their patrons which dominated and modified the principles previously governing them. . . . Thereafter, for all messages sent in interstate or foreign commerce, the outstanding consideration became that of uniformity and equality of rates. Uniformity demanded that the rate represent the whole duty and the whole liability of the company. It could not be varied by agreement; still less could it be varied by lack of agreement. The rate became, not as before a matter of contract by which a legal liability could be modified, but a matter of law by which a uniform liability was imposed.'' (*Western Union Telegraph Co. v. Esteve Bros. & Co.*, 256 U. S. 566.)

Pursuant to this enactment the interstate commerce commission decided upon investigation that the existing rules and rates of the telegraph companies limiting their liability for negligence were unreasonable and prescribed rules and rates therefor which fixed the maximum liability in case of unrepeated messages at not less than $500. (*Cultra v. Western Union Telegraph Co.*, 61 I. C. C. 541 (1921).) In accordance with the order entered in the *Cultra* case the Western Union

Telegraph Company prepared its new rules and tariffs relating to messages and subsequently extended them to money orders by including the provision in question.

*Wernick v. Western Union Telegraph Company*, 290 Ill. App. 569 (1937), was one of the earliest cases requiring the construction of the tariff regulation in question. We were there called upon to decide whether the amount of $500 as stipulated therein constituted liquidated damages for nonpayment or underpayment of a money order transmitted through the Western Union Telegraph Company or whether it was merely a limitation on the liability of the company to the extent of actual damages sustained. We construed the regulation as a limitation upon the liability of the company for rate-making purposes and held that plaintiff could recover for actual damages shown, but not to exceed the sum of $500. This conclusion was predicated upon the historical origin and effect given to similar tariff regulations governing public carriers in *Western Union Telegraph Co. v. Esteve Bros. & Co.*, 256 U. S. 566, and *Western Union Telegraph Co. v. Priester*, 276 U. S. 252.

Plaintiff relies on *Western Union Telegraph Co. v. Nester*, 106 F. (2d) 587 (1939), wherein the circuit court of appeals (ninth district), with one of the justices dissenting, construed this precise regulation as an agreement for liquidated damages, despite the sender's failure to prove actual damages. The Supreme Court of the United States granted certiorari, and, since briefs were filed in this cause, has reversed the decision of the circuit court of appeals, quoting with approval the construction we placed upon the tariff regulation in the *Wernick* case. The precise question was also considered in *Miazza v. Western Union Telegraph Co.*, 50 Ga. App. 521, 178 S. E. 764 (1935), with the same result. All these decisions discuss the origin and effect of the stipulated value of the

regulation and leave no doubt that the amount of $500 stated in the contract is for the purpose of limiting, but not of fixing, the damages. Under these decisions plaintiff is required to prove actual damages and recovery is limited in any event to the stipulated amount of $500. The cogent reasons for this limitation are twofold: telegraph rates imposed by the Federal government are framed on the basis of determining the cost of rendering the service of rapid transmission to the public at reasonable rates and with a fair margin of profit to the carrier, and if liability were to be unlimited, the company's ability to continue business might be seriously endangered; certainly it could not continue in business operating under the present rate structure. On the other hand, if the rates should be increased sufficiently to offset the higher expense resulting from unlimited liability, the carrier's volume of business would materially decrease and its services would not be available at prices within reach of the general public. (*Cultra v. Western Union Telegraph Co.*, 61 I. C. C. 541.)

The case at bar involved an interstate transaction. Under the stipulated facts plaintiff was deprived of winning $1,450 on Mintson through misdirection of the money order. The company's negligence is conceded. The question therefore presented is whether plaintiff should have been awarded as special damages the maximum amount of $500 stipulated in the contract.

Under the rule generally applied to the nonpayment or underpayment of money orders transmitted through telegraph companies, the measure of damages is the interest on the money from the time it should have been delivered to the time it was actually delivered, together with the cost of the message. This rule was followed in *Lust v. Western Union Telegraph Co.*, 243 Ill. App. 624 (Abst.) (1926), not reported, general number 31035, wherein the court held that any other

loss would be too remote and said that "ordinarily, the measure of damages for the nonpayment of money when due is interest from the time of the default to the time the money is paid; and this rule applies to the failure on the part of a telegraph company to perform its agreement to transmit money to a person at a distant point." (Citing Jones on Telegraph & Telephone Companies, sec. 567; 37 Cyc. 1775; and *Smith v. Western Union Telegraph Co.*, 150 Pa. St. 561.) In an earlier case, *Churches v. Western Union Telegraph Co.*, 108 Kas. 431 (1921), a farmer purchased two teams of horses at Kansas City, Missouri, and telegraphed his bank at Lawrence, Nebraska, to forward him $600 to pay for them. Defendant failed to transmit the money and plaintiff sued the telegraph company for board for himself and his teams and other damages, including his traveling expenses and the cost of the message. The court stated the rule as follows: "The defendant contends that the measure of damages is the cost of transmitting the telegram and interest on the $600 for the time it was held by the telegraph company, about ten days. The authorities support this contention." The same rule was applied under similar circumstances in 24 Ky. Law Reports 452; *Loudon v. Taxing Dist. of Shelby County*, 104 U. S. 771 (1881); and *Green Briar Drainage Dist. of Crawford and Jasper Counties v. Clark*, 292 Fed. 828.

However, the authorities recognize an exception to this rule in cases where the telegraph company has notice, at the time of making the contract, of such special facts or circumstances as to justify the conclusion that special or unusual damages are within the contemplation of the parties. *Lust v. Western Union Telegraph Co.*, 243 Ill. App. 624 (Abst.); 37 Cyc. 1775. The exception dates back to the early case of *Hadley v. Baxendale*, 9 Exchequer 341 (1854), and it has since been generally held that whether or not a telegraph company incurs any special liability, for

its default in transmitting money, depends on whether it has been put on notice of circumstances such as would reasonably have led an ordinarily prudent person to anticipate consequential losses or injuries from a failure to deliver the message. 80 A. L. R. 301 (citing cases); *Western Union Telegraph Co. v. Hall,* 287 Fed. 297. It was stipulated in the case at bar that defendant had no notice or knowledge of the purpose for which the money was being transmitted.

Plaintiff's counsel evidently recognize the foregoing rule and exception, for they say in their brief: "The measure of damages imposed by common law upon telegraph companies for negligence as established by decisions of this state and other states, was the application of the rule that the person breaching a contract could only be liable for damages which fairly and reasonably should be considered as flowing from the breach of contract, or such as may reasonably be supposed to have been in the contemplation of the parties at the time they made the contract as the probable result of the breach of it. Thus, in order to collect damages against a telegraph company for negligence at common law, it was necessary to prove not only that damages were sustained but also that the defendant had or should have had knowledge from the contents of the telegram that said damage might result from a breach of contract resulting through negligence. So in the case of a money order, the same rule applied and recovery to the fullest extent was therefore limited to those cases where the defendant was put on notice of the purpose for which the money was transmitted." It is urged, however, "that the common law liability of the defendant no longer exists and the liability . . . must be determined by the construction of the tariff regulation in question." This argument made by plaintiff before the Supreme Court had filed its opinion in *Western Union Telegraph Co. v. Nester,* 309 U. S. 582, is predicated largely

upon the contention that the amount of $500 stipulated in the tariff regulation constituted liquidated damages; but since the court, by construing the regulation as a limitation upon the liability of the company and not as liquidated damages, has finally resolved the question adversely to plaintiff, the argument loses its principal support. Plaintiff relies upon language employed in *Western Union Telegraph Co. v. Esteve Bros. & Co.*, 256 U. S. 566, and *Western Union Telegraph Co. v. Priester*, 276 U. S. 252, from which he seeks to derive additional support of his position. In the *Esteve* case a company engaged in transmitting telegraphic messages in the United States and by cable between here and France established a tariff offering a lower rate for unrepeated and a higher rate for repeated messages and limiting its liability for mistakes in transmitting unrepeated messages to the tolls accruing to it therefrom, and filed the tariff with the interstate commerce commission under the Interstate Commerce Act, as amended June 18, 1910. (Chapter 309, sec. 7, 36 Stat. at L. 539.) An unrepeated message sent by plaintiffs from Spain passed over other lines to Havre where it was received by the company and sent to New Orleans, an error being introduced on the land lines in this country which caused the plaintiffs a loss of some $31,000. The provision limiting liability was not expressed on the blank used in sending nor did the senders know of its adoption and filing. The court held that whatever the legal incidents of the transmission over the foreign lines, the company in carrying the message over its own lines from Havre was governed by the Interstate Commerce Act, as amended; that the senders of the message were bound as a matter of law by the provision limiting liability, without regard to their knowledge or assent, because it was a part of a lawfully established rate which could not be departed from without creating an undue pref-

erence or advantage in violation of section 3 of the statute; and that where a cable company offered a lower rate, with limited liability, for unrepeated messages, and a higher rate for repeated messages, with a higher but still limited liability, the senders of an unrepeated message who paid the lower rate could not escape its attendant limitation upon the ground that liability under the higher rate was also limited, since the latter limitation, if invalid, would not bind those who used the higher rate, and the question of its validity was not material in the case. The *Priester* case involved a provision in the tariff filed by the Telegraph Company pursuant to the Interstate Commerce Act, as amended, fixing a lower rate for an unrepeated message and limiting the liability of the company for mistake in its transmission to the amount received for sending it. It was there held that the tariff regulation represents the entire liability of the company for a mistake of that kind; and being statutory, cannot be enlarged by the courts upon the ground that the mistake was due to ''gross'' negligence.

Neither of these cases supports the contention that the common-law rule for ascertaining damages has been superseded by the tariff regulations. Under the established rule for construing the regulation in question, the extent of the common-law liability of telegraph companies for negligence has been limited by their tariff provisions, unless the sender places a greater value than $500 on his money order and pays or agrees to pay therefor. Plaintiff must in each instance prove actual damages and the company is liable under the common law, to the extent for which it is liable under its tariff. We conceive no reason for holding that the control of interstate business of telegraph companies by the Federal government, through published rules, regulations and tariffs, was intended to change or affect the long established rule that recovery

for special damages can only be had in cases where the special damage was within the contemplation of the parties, and we find no authority so holding.

Judgment of the municipal court is affirmed.

*Judgment affirmed.*

SCANLAN, P. J., and SULLIVAN, J., concur.