2025 IL App (1st) 241461-U

FOURTH DIVISION
Order filed: June 18, 2025

Nos. 1-24-1461, 1-24-2607 (cons.)

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| GW 3800 MILWAUKEE, LLC, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellant, | ) | Cook County. |
| | ) | |
| v. | ) | No. 22 L 1695 |
| | ) | |
| BLOOM BOUNCE, LLC, JEREMY BLOOM, and | ) | |
| SALLY BLOOM, | ) | Honorable |
| | ) | Ronald F. Bartkowicz, |
| Defendants-Appellees. | ) | Judge, presiding. |

_____

JUSTICE HOFFMAN delivered the judgment of the court.
Presiding Justice Rochford and Justice Ocasio concurred in the judgment.

**ORDER**

¶ 1   *Held*:   In an action for breach of contract brought by a landlord following a tenant's termination of a lease agreement based on a prior alleged breach by the landlord, the circuit court's order granting summary judgment in favor of the tenant is reversed because there are issues of material fact regarding the tenant's possible waiver of strict performance and the materiality of the landlord's alleged breach.

¶ 2   This consolidated appeal concerns a dispute between GW 3800 Milwaukee, LLC ("GW"),

and Bloom Bounce, LLC ("Bloom Bounce"), along with Bloom Bounce's member-managers Sally

Bloom and Jeremy Bloom (collectively with Bloom Bounce, "Defendants"), over Bloom Bounce's

termination of a lease agreement with GW. GW filed an action against the Defendants, alleging breach of contract. The Defendants moved for summary judgment, and the circuit court granted their motion, entering judgment in their favor. We reverse the trial court's judgment and remand for further proceedings.

¶ 3     At the center of this case is a January 29, 2020, lease ("Lease") between GW and Bloom Bounce under which Bloom Bounce was to lease commercial real estate ("Premises") from GW for 10 years and 2 months for the purpose of operating a "Pump It Up" bounce-house franchise. Pump It Up utilizes large inflatable structures to provide an indoor play space for children. Sally and Jeremy signed the Lease as guarantors, personally guaranteeing Bloom Bounce's payment of rent and the performance of Bloom Bounce's obligations under the Lease. Several provisions of the Lease are at issue in the present appeal, which focuses on whether Bloom Bounce was entitled to terminate the Lease based on GW's failure to tender possession of the Premises in a timely manner and in the condition required by the Lease.

¶ 4     Article I(b) of the Lease defined the "Possession Date" and set forth additional obligations and rights surrounding the transfer of possession from GW to Bloom Bounce, including Bloom Bounce's right to terminate the Lease if GW failed to deliver possession of Premises in a timely manner:

> "The 'Possession Date' is the date [GW] delivers possession of the Premises to [Bloom Bounce] in the condition required under this Lease (including, without limitation, as set forth in Section 2.03 below). On the Possession Date, [Bloom Bounce] shall accept possession of the Premises and execute the form of Tenant Acceptance of Premises as attached hereto as Exhibit G; provided [Bloom Bounce's] acceptance of the Premises shall

be subject to (a) [GW's] completion of a 'punchlist' of incorrect, incomplete or damaged items, which punchlist items will be agreed upon by [GW] and [Bloom Bounce] within thirty (30) days thereafter and [GW] will use its best efforts to correct or repair such punchlist items within thirty (30) days after such 30-day period, and (b) any latent defects of which [Bloom Bounce] gives [GW] written notice within one (1) year after the Possession Date. *** *Notwithstanding anything to the contrary in this Lease, if the Possession Date does not occur on or before September 30, 2020 (the 'Estimated Possession Date'), then [Bloom Bounce] may elect to terminate this Lease by delivery of written notice thereof to [GW] at any time thereafter.* In the event of a termination of this Lease pursuant to the immediately preceding sentence, the parties shall have no further obligations or liabilities under this Lease (except those which, by the provisions of this Lease, expressly survive the expiration or termination of the Term of this Lease)." (Emphasis added.)

¶ 5    Section 2.03 of the Lease further provided, in relevant part, that "[GW], at [GW's] sole cost and expense, shall deliver the Premises to [Bloom Bounce] on the Possession Date in 'warm shell condition' (as defined in Exhibit L), broom clean condition, in compliance with all Applicable Laws, municipal codes and ordinances, and separately demised from other space in the building." "Warm Shell Condition," in turn, was defined in Exhibit L as: "(i) Demised, with all utilities and the heating, ventilation and cooling (HVAC) system stubbed to space for Tenant distribution, drop ceiling, restrooms, plumbing and interior lighting. All site work and storefronts per [GW's] plans; and (ii) Installation of a new HVAC unit exclusively serving the Premises."

¶ 6    The Lease also provided under section 12.02 that, in relevant part:

"The failure of [GW] or [Bloom Bounce] to insist at any time upon the strict performance of any covenant or agreement of [Bloom Bounce] or [GW] or to exercise any option, right, power or remedy contained in this Lease shall not be construed as a waiver or a relinquishment thereof. No provision of this Lease shall be deemed to have been waived by [GW] or [Bloom Bounce] unless such waiver is in writing, signed by [GW] or [Bloom Bounce]."

Finally, section 12.04 of the Lease required Bloom Bounce to provide GW with written notice of any alleged default by GW and to provide GW 30 days to cure such a default.

¶ 7 The pleadings and summary judgment evidence set forth the following history of relevant events. On September 22, 2020, the parties executed an amendment to the Lease that extended the Possession Date to October 1, 2020. On October 2, 2020, after GW failed to deliver possession of the Premises on October 1, Bloom Bounce exercised its right to terminate the Lease. On November 16, 2020, the parties reinstated the Lease and executed a second amendment that changed the Possession Date to June 30, 2021.

¶ 8 At some point in 2020, GW delivered its plans for the Premises to Bloom Bounce. Those plans did not show any drop ceilings, restrooms, plumbing, or interior lighting to be installed by GW, and Bloom Bounce did not express any objection to those plans. Bloom Bounce also provided its own plans to GW, which showed that Bloom Bounce would install the drop ceilings, restrooms, plumbing, and interior lighting.

¶ 9 On December 3, 2020, GW told Bloom Bounce by email that the Premises were ready and provided photographs of the Premises that, according to GW, showed that no drop ceilings, restrooms, plumbing, or interior lighting had been installed. Sally responded that the Premises

looked "great," but that Bloom Bounce was "waiting to see what happens" with developments in the ongoing COVID-19 pandemic.

¶ 10    In January 2021, Bloom Bounce accepted keys to the Premises, and on March 10, 2021, Bloom Bounce notified GW that it intended to begin seeking permits for developing the Premises. On May 4, 2021, Bloom Bounce's contractor, CoreBuilt, inspected the Premises to review GW's work and confirm the remaining work to be done. Following that inspection, Bloom Bounce did not raise any objection to the state of the Premises or provide a punch list to GW. In the first week of August 2021, CoreBuilt began development of the premises, and on August 13, 2021, Bloom Bounce's inflatables were delivered to the Premises.

¶ 11    In the second week of September, the parties held a meeting at the Premises, which was attended by Sally, GW's manager Mitch Goltz, Bloom Bounce's real estate broker Paul Bryant, CoreBuilt's project manager Eric Okeson, Bloom Bounce's architect Mark Diganci, and Bloom Bounce's general manager Brett Anderson. According to GW, the subject of the meeting was Bloom Bounce's concern that Bloom Bounce was over budget, while Bloom Bounce alleges that the purpose was to discuss the remaining work to be completed by GW. During the meeting, the parties agreed that GW would provide $90,000 toward certain outstanding work in the form of rent abatements, and Bloom Bounce would cover the remaining $60,000 that was estimated to be necessary. Following the conclusion of the meeting, Bloom Bounce agreed to move forward, and Sally was under the assumption that the parties would continue with their obligations under the Lease. Over the next two months, CoreBuilt continued to work on preparing the Premises for Bloom Bounce to begin operations. During that time, the parties also negotiated a third amendment

to the Lease, which contained provisions for rent abatements and a modification of the definition of "warm shell condition," but the amendment was ultimately never agreed to or executed.

¶ 12    On November 9, 2021, Sally learned that the Premises was not tall enough to accommodate seven of Bloom Bounce's ten inflatables. Sally attributed the error to Bloom Bounce's architect. Nonetheless, construction at the Premises continued through November 19, 2021.

¶ 13    On December 1, 2021, Sally sent a letter to GW terminating the Lease on the grounds that GW had not tendered possession of the Premises in warm shell condition by the possession date specified in the Lease, June 30, 2021. Specifically, Sally noted that the Premises was not in warm shell condition because GW had not installed a drop ceiling or restrooms. Separately, Sally told CoreBuilt's president, James Neavolls, that she was ending the project because the HVAC ductwork in the Premises was too low to accommodate the Pump It Up inflatables. Sally provided the same reasoning to Pump It Up when she wrote to the company on January 27, 2022, to terminate Bloom Bounce's franchise agreement. In an email, Sally explained to Pump It Up that the inflatables would not fit under the ductwork and that the only solution was to put the ductwork on the roof at a cost of $140,000, which Bloom Bounce was unwilling to pay. For those reasons, she stated, Bloom Bounce terminated the Lease.

¶ 14    On February 18, 2022, GW initiated this action by filing a two-count complaint against the Defendants, seeking damages from Bloom Bounce for breach of contract and damages from Sally and Jeremy as guarantors. The Defendants filed a motion to dismiss, which was denied, and then filed an answer and affirmative defenses.

¶ 15 During the course of discovery, the parties took depositions of various people involved in the case. Relevant to the present appeal, several witnesses provided testimony relating to the meaning of "warm shell condition," as that term was used in Exhibit L of the Lease.

¶ 16 GW manager Goltz testified that he had been involved in negotiating and signing hundreds of commercial leases in his career, including the Lease at issue here. He explained that warm shell condition "by commercial reasonable expectations is a space that's demised with utilities, with HVAC stubbed to the space, is separate from any other space in the building, and any sort of outside site work affiliated with that." It was Goltz's belief that HVAC distribution, the drop ceiling, restrooms, plumbing, and lighting were Bloom Bounce's responsibility. Goltz further opined that the definition provided in the Lease was unambiguous and that it was standard commercial practice for the landlord to stub the utilities to the space and for the tenant to handle the remaining items, which depend on the tenant's specific plans for the space. Goltz explained that the items at issue "require a tremendous amount of communication [between landlord and tenant], a tremendous amount of coordination and frankly a full set of interior plans to show how the lighting operates, how the ceiling operates, how the HVAC gets distributed."

¶ 17 Sally testified that she had no previous experience in commercial real estate development and had never heard of the term "warm shell condition" before negotiating the terms of the Lease. Sally stated that she believed that it was GW's responsibility to install the drop ceiling, bathrooms, plumbing, and interior lighting because "there's no distribution that can be had with drop ceiling. You can't distribute restroom. You can't distribute lighting. So I read that as it is plainly written in plain English to say system stubbed into the space for tenant distribution, comma, drop ceiling, comma, restroom, comma, plumbing and interior lighting." Sally acknowledged that Pump It Up

had specific interior lighting requirements for its franchises and that Bloom Bounce had never provided those requirements to GW for GW to install conforming lighting.

¶ 18    CoreBuilt owner Neavolls testified that the definition of "warm shell condition" in the Lease was "not very clear" and "could be interpreted different ways." Speaking more generally, in Neavolls' experience "warm shell condition" is "usually a landlord deliverable, you know, a white box, warm shell," but the meaning of the term is "case dependent" because "everybody has a different definition of it."

¶ 19    CoreBuilt project manager Okeson testified that when he first read the Lease at the outset of the project he believed that it was GW's responsibility to install the drop ceiling, restrooms, plumbing, and interior lighting. However, at the time of his deposition, he stated: "As I read it today, given I have more experience than I did two years ago, I would have asked more questions. I think it's not clear." Okeson added, "Today, I would expect basically a landlord's permit drawing to describe this and the landlord's confirmation. I don't feel that [Exhibit L] accurately describes landlord work. There's -- this paragraph is very wide for interpretation."

¶ 20    Real estate broker Bryant agreed that, generally, "warm shell condition with space fully demised" means that "landlord would be responsible for ensuring that the electricity, the plumbing, the HVAC were all brought to the space so that the tenant could then do the work on the inside and then complete what would be the finish construction." However, Bryant added that "[o]ur industry is not black and white. There's a lot of terms like this that are a bit gray. So generally -- like I said, you can ask 10 different people and they might give you 10 remotely different answers."

¶ 21    Real estate broker Westin Kane, who was Bryant's partner, testified that he had a "strong understanding" of the term "warm shell condition," which he understood to mean that HVAC and

plumbing would be stubbed to the tenant's space, and there would be "some form of lighting already in place." However, Kane noted that "there's not one right answer," and the details are "usually going to be debated between landlord and tenant." That includes the installation of bathrooms, as "some landlords believe that to be including a toilet in the space and some -- and fixtures. And some would say [plumbing] just needs to be stubbed to the space."

¶ 22     On February 9, 2024, the Defendants filed a motion for summary judgment as to both counts of GW's complaint. The Defendants argued that Bloom Bounce was entitled to terminate the Lease because GW had not delivered possession of the Premises in a timely manner and in warm shell condition, as that term was defined in the Lease. Specifically, the Defendants contended that Exhibit L clearly and unambiguously required GW to install restrooms and interior lighting by the possession date set forth in Article I(b) of the Lease, which it had not done. Relatedly, the Defendants argued that, because Bloom Bounce did not breach the Lease, Sally and Jeremy were not liable as guarantors.

¶ 23     In response, GW argued that both the plain language of the definition of "warm shell condition" and the term's trade usage support its position that Bloom Bounce was responsible for installing drop ceilings, restrooms, plumbing, and interior lighting. GW also raised alternative arguments that Exhibit L was ambiguous, that Bloom Bounce waived strict compliance with Article I(b) of the Lease setting the "possession date" by which GW was to tender possession of the Premises in warm shell condition, that the failure to tender possession in warm shell condition by the possession date was not a material breach entitling Bloom Bounce to terminate the Lease, and that issues of material fact regarding Bloom Bounce's liability preclude summary judgment on GW's guaranty claim against Sally and Jeremy.

¶ 24    Following a hearing at which the parties presented their arguments, the circuit court entered an order on June 21, 2024, granting the Defendants' motion for summary judgment as to both counts of GW's complaint. The court specifically found that Exhibit L was unambiguous and required GW to install the restrooms and interior lighting in the Premises. Because GW failed to do so by the possession date specified in the Lease, the court explained, Bloom Bounce was entitled to terminate the agreement. In reaching that conclusion, the court noted that the deposition testimony of Goltz, Bryant, and Sally did not aid GW's trade-usage argument, and the court did not discuss GW's alternative waiver and material-breach arguments. GW then filed a notice of appeal.

¶ 25    Shortly after GW initiated its appeal, the Defendants filed a petition for attorneys' fees and costs pursuant to the terms of the Lease. GW then filed a motion seeking a finding under Supreme Court Rule 304(a) (eff. Mar. 8, 2016) and a stay of proceedings on the Defendants' motion for fees and costs. The circuit court granted GW's motion and entered an order on December 19, 2024, finding that there was no just reason for delaying either enforcement or appeal or both of the court's June 21, 2024, order granting summary judgment in favor of the Defendants. GW then filed another notice of appeal from that order. We have consolidated the two appeals and resolve them together here.

¶ 26    GW presents what we view as three issues on appeal, as well as one alternative argument. In its first two issues, GW contends that summary judgment was inappropriate because there are genuine issues of material fact regarding (1) whether Bloom Bounce waived its right to enforce strict compliance with Article I(b) and Section 2.03 of the Lease and (2) whether GW's alleged failure to strictly comply with those provisions amounted to a material breach justifying Bloom

Bounce's termination of the Lease. GW then argues that (3) the plain language of Exhibit L and its definition of "warm shell condition" required Bloom Bounce, not GW, to install restrooms and interior lighting. In the alternative, GW asserts that the language of Exhibit L is ambiguous and presents a genuine issue of material fact regarding its meaning that should have precluded summary judgment. We agree with GW's first two contentions regarding waiver and the materiality of the alleged breach, but we reject its arguments regarding the meaning of Exhibit L.

¶ 27    "Summary judgment is proper where, when viewed in the light most favorable to the nonmoving party, the pleadings, depositions, admissions, and affidavits on file reveal that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Hernandez v. Alexian Brothers Health System*, 384 Ill. App. 3d 510, 518 (2008). "In order to survive a motion for summary judgment, the nonmoving party must come forward with evidentiary material that establishes a genuine issue of [material] fact." *Hotze v. Daleiden*, 229 Ill. App. 3d 301, 305 (1992). "The party opposing summary judgment need not prove his case to defeat the motion, but must present some factual basis that would arguably entitle him to judgment." *William Blair & Co., LLC v. FI Liquidation Corp.*, 358 Ill. App. 3d 324, 333 (2005) (citing *Flint v. Court Appointed Special Advocates of Du Page County, Inc.,* 285 Ill. App. 3d 152, 162 (1996)). "Our review of the trial court's grant of summary judgment is *de novo*." *Sacramento Crushing Corp. v. Correct/All Sewer, Inc.*, 318 Ill. App. 3d 571, 574 (2000).

¶ 28    GW first argues that Bloom Bounce implicitly waived strict compliance with the June 30, 2021, possession date established by the second amended Lease by continuing to work throughout the summer and fall of 2021 on readying the Premises for the opening of business, by having its inflatables delivered to the Premises in August 2021, and by agreeing to continue moving forward

with the Lease after GW offered to provide rent abatements at the September 2021 meeting. GW also asserts that Bloom Bounce failed to comply with the requirement in Section 12.04 of the Lease that Bloom Bounce provide GW with written notice of an alleged default and allow GW 30 days to cure. However, this latter argument was not raised below in GW's opposition to the Defendants' motion for summary judgment and, therefore, has been forfeited. See *Haudrich v. Howmedica, Inc.*, 169 Ill. 2d 525, 536 (1996) ("It is well settled that issues not raised in the trial court are deemed waived and may not be raised for the first time on appeal.").

¶ 29    Bloom Bounce argues in response that its words or actions never suggested an intention to waive its right to terminate the Lease under Article I(b) in the event that GW failed to deliver the Premises in warm shell condition by the possession date. For support, Bloom Bounce recounts that its right to do so was preserved in the enacted first and second amendments to the Lease, as well as the proposed but unsigned third amendment, and it points to Sally's deposition testimony recalling that the parties held a meeting in September 2021 to discuss the work the GW still needed to complete.

¶ 30    We agree with GW that there are genuine issues of material fact regarding waiver and that summary judgment was, therefore, inappropriate. It is well established that "[w]hether a party's course of conduct waives strict compliance with a contractual provision and results in forfeiture is generally a question of fact[,] [and] such a question is unsuitable for disposition by way of summary judgment." *Giannetti v. Angiuli*, 263 Ill. App. 3d 305, 313 (1994) (citing *Smith v. Sturgeon*, 35 Ill. App. 3d 750, 751 (1976)); see also *Lynch Imports, Ltd. v. Frey*, 200 Ill. App. 3d 781, 789 (1990) ("[T]he determination of subjective fact questions, such as waiver and intent, strains the use of summary judgment. 'Where the inferences which the parties seek to have drawn

deal with questions of motive, intent or subjective feelings and reactions, summary judgment is particularly inappropriate.' " (quoting *Schuster v. East St. Louis Jockey Club, Inc.*, 37 Ill. App. 3d 483, 487 (1976))).

¶ 31    It is reasonable to infer from the summary judgment evidence concerning Bloom Bounce's actions in this case that Bloom Bounce had waived its right to terminate the Lease based on GW's failure to deliver possession of the Premises in warm shell condition by June 30, 2021. First, as a simple matter, Bloom Bounce did not terminate the Lease immediately after the possession date passed. That failure to exercise its right to terminate the Lease upon GW's alleged failure to timely deliver possession of the Premises in warm shell condition suggests, to some degree, an intention to forego that right. Second, Bloom Bounce had its contractor continue to work on the Premises throughout the summer and fall of 2021, further implying that Bloom Bounce did not intend to enforce strict compliance with GW's obligation to deliver possession of the Premises in warm shell condition by June 30, 2021. Third, Bloom Bounce had its inflatables delivered to the Premises in August 2021, again suggesting that it had declined to require strict compliance with the provisions of Article I(b) and Section 2.03 of the Lease and intended to continue under the Lease. Finally, Sally testified in her deposition that, following the meeting between the parties in September 2021, Bloom Bounce explicitly agreed to move forward, and she was under the assumption that the parties would continue with their obligations under the Lease.

¶ 32    These facts create a genuine issue of material fact that should have precluded summary judgment in favor of Bloom Bounce. This conclusion is demonstrated by a case cited by GW, *Kitsos v. Terry's Chrysler-Plymouth, Inc.*, 70 Ill. App. 3d 728 (1979). In *Kitsos*, two parties contracted for the sale of a car dealership. *Id.* at 729. The deal was to close on August 1, 1976,

unless modified in writing by the parties. *Id.* The parties failed to close on August 1 because the buyer was waiting for approval of its application for a franchise from Chrysler. *Id.* The parties did not extend the closing date in writing, but they continued taking actions towards completion of the contract. *Id.* On August 13, the seller terminated the contract for the buyer's failure to close on August 1. *Id.* at 729-30. The buyer sued the seller for breach of contract, and the circuit court granted summary judgment in favor of the seller. *Id.* at 730. On appeal, this court reversed the judgment. *Id.* at 731-32. We first observed that "parties to a contract may waive delays in performance by conduct which indicates an intention to regard the contract as still in force and effect, *** even where the contract requires that agreements to extend the date of performance must be set forth in writing." (Citations omitted.) *Id.* at 731. We then held that the parties' actions in continuing to move towards completion of the contract after August 1 amounted to a waiver of the seller's right to compel strict compliance with the August 1 closing date. *Id.* at 721-32.

¶ 33    The present case is no different. The possession date passed without GW tendering possession of the Premises in warm shell condition. Yet, Bloom Bounce did not terminate the contract in response to that alleged noncompliance, and the parties continued working towards performance of the contract for several more months. Under these circumstances, we agree with GW that it can be reasonably inferred that Bloom Bounce waived strict compliance with Article I(b) and Section 2.03. The fact that the amended versions of the Lease retained Bloom Bounce's *general* right to terminate the Lease in the event of a default by GW does not negate this conclusion that there are facts supporting GW's assertion that Bloom Bounce waived the right to terminate the Lease based on this specific alleged default.

¶ 34    As an additional consideration within this issue, we note that Bloom Bounce also asserts that the non-waiver provision of Section 12.02 of the Lease precluded any waiver in the absence of such a waiver being made in writing. However, Bloom Bounce makes this argument in a conclusory manner, inserting it as merely a part of one sentence in its conclusion of its analysis of the waiver issue. It provides no substantive discussion of the applicability of that provision, which is notable because "the weight of the authority in Illinois holds that Waiver Only in Writing provisions can be waived by words and deeds of the parties, so long as the waiver is proved by clear and convincing evidence." *Chicago College of Osteopathic Medicine v. George A. Fuller Co.*, 776 F.2d 198, 202 (7th Cir. 1985) (collecting Illinois cases). Such a conclusive and undeveloped argument, presented without further discussion or citation to authorities, is forfeited. See Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020) (requiring an argument "contain the contentions of the [party] and the reasons therefor, with citation of the authorities and the pages of the record relied on"); *Block 418, LLC v. Uni-Tel Communications Group, Inc.*, 398 Ill. App. 3d 586, 590 (2010) (holding that an undeveloped two-sentence argument unsupported by relevant authority was forfeited).

¶ 35    In its second issue, GW asserts that summary judgment was also inappropriate because there are genuine issues of material fact regarding whether its alleged failure to timely tender possession of the Premises in warm shell condition was a material breach justifying Bloom Bounce's termination of the Lease. Specifically, GW contends that Illinois law does not allow a party to observe an alleged breach, continue performing under the contract, and then later terminate the contract based on the prior breach without itself incurring liability. Bloom Bounce responds

that the terms of the Lease gave it an absolute right to terminate the Lease at any time based on a breach by GW. We again agree with GW.

¶ 36    "Regardless of the language used by the parties, a breach, to justify a premature termination or forfeiture of a lease agreement, must have been material or substantial." *Wolfram Partnership, Ltd. v. LaSalle National Bank*, 328 Ill. App. 3d 207, 222-23 (2001) (citing *First National Bank of Evergreen Park v. Chrysler Realty Corp.*, 168 Ill. App. 3d 784, 793 (1988)). "A breach is material where the covenant breached is one of such importance that the contract would not have been entered into without it." *Id.* (citing *Galesburg Clinic Ass'n v. West*, 302 Ill. App. 3d 1016, 1019 (1999), and *United States Fidelity & Guaranty Co. v. Old Orchard Plaza Limited Partnership*, 284 Ill. App. 3d 765, 776 (1996)). "Because the determination of whether a breach is 'material' depends on the inherent justice of the matter and presents a complicated question of fact involving consideration of several factors ***, resolution of this issue is generally not appropriate at the summary judgment stage ***." (Citations omitted.) *Id.*

¶ 37    Further, under the "partial breach doctrine," if a party commits what the injured party believes is a material breach and the injured party elects to continue performing under the contract, the injured party remains bound by its obligation to perform and may not later terminate the contract based on the prior breach without incurring liability itself. *PML Development LLC v. Village of Hawthorn Woods*, 2023 IL 128770, ¶¶ 51-52. As our supreme court has explained,

> "following a material breach, the injured party reaches a fork in the road: it may either continue the contract (retain its benefits of the bargain and sue for damages) or repudiate the agreement (cease performing and sue for damages). See [Restatement (Second) of Contracts] § 246, cmts. a-c, illus. 1-3; [*Emerald Investments Ltd. Partnership v. Allmerica*

*Financial Life Insurance & Annuity Co.*, 516 F.3d 612, 618 (7th Cir. 2008)]. *If the party elects to continue with the contract, it cannot suspend performance later and then claim it had no duty to perform based on the first material breach.* This election converts the material breach to a 'partial' breach. '[T]he injured party may sue for any damages caused by the partial breach, *but having elected to keep the contract in force, the injured party must continue to perform the contract on pain of likewise incurring liability for a breach.*' " (Emphasis added, citations omitted.) *PML Development*, 2023 IL 128770, ¶ 52 (quoting *Dustman v. Advocate Aurora Health, Inc.*, 2021 IL App (4th) 210157, ¶ 38.

¶ 38    As we recounted in our discussion of the issue of waiver, the summary judgment evidence demonstrates that, after the June 30, 2021, possession date passed without the transfer of possession in warm shell condition, Bloom Bounce did not terminate the Lease and instead continued to perform under the contract for more than four months. Further, Sally explicitly acknowledged during her deposition that the September 2021 meeting of the parties resulted in an agreement to continue with their obligations under the Lease. Accordingly, there is a genuine issue of material fact regarding whether Bloom Bounce's decision to continue effectively rendered GW's alleged breach a partial one and whether Bloom Bounce thereby forfeited its ability to faultlessly terminate the Lease based on GW's prior alleged breach. Therefore, summary judgment in favor of Bloom Bounce was inappropriate on this basis as well.

¶ 39    Finally, we address the definition of "warm shell condition" contained in Exhibit L of the Lease. Bloom Bounce contends that the provision was unambiguous and obligated GW to install restrooms and interior lighting. GW primarily argues that Exhibit L left that responsibility to

Bloom Bounce, and in the alternative it argues that the language used in Exhibit L is ambiguous. We agree with Bloom Bounce's view of the issue.

¶ 40    "The primary goal of contract interpretation is to give effect to the intent of the parties." *Richard W. McCarthy Trust Dated September 2, 2004 v. Illinois Casualty Co.*, 408 Ill. App. 3d 526, 535 (2011) (citing *Virginia Surety Co. v. Northern Insurance Co. of New York,* 224 Ill. 2d 550, 556 (2007)). "In determining the intent of the parties, a court must consider the contract document as a whole and not focus on isolated portions of the document." *Id.* (citing *Gallagher v. Lenart,* 226 Ill. 2d 208, 233 (2007)). "If the language of a contract is clear and unambiguous, the intent of the parties must be determined solely from the language of the contract document itself, which should be given its plain and ordinary meaning, and the contract should be enforced as written." *Id.* (citing *Virginia Surety*, 224 Ill. 2d at 556, and *J.M. Beals Enterprises, Inc. v. Industrial Hard Chrome, Ltd.*, 194 Ill. App. 3d 744, 748 (1990)).

¶ 41    "Contract construction and interpretation are generally well suited to disposition by summary judgment." *William Blair & Co.*, 358 Ill. App. 3d at 334 (citing *Bankier v. First Federal Savings & Loan Ass'n of Champaign*, 225 Ill. App. 3d 864, 869 (1992), and *Continental Mobile Telephone Co. v. Chicago S M S A Ltd. Partnership,* 225 Ill. App. 3d 317, 322 (1992)). "When, however, the language of a contract is ambiguous, its meaning must be ascertained through a consideration of extrinsic evidence and summary judgment is, therefore, inappropriate." *Id.* "A contract term is ambiguous if it can reasonably be interpreted in more than one way due to the indefiniteness of the language or due to it having a double or multiple meaning." *Id.* (citing *Zurich Midwest, Inc. v. St. Paul Fire & Marine Insurance Co.*, 159 Ill. App. 3d 961, 963 (1987)). Whether

a contract is ambiguous is a question of law. *Id.* (citing *Village of Glenview v. Northfield Woods Water & Utility Co.*, 216 Ill. App. 3d 40, 48 (1991)).

¶ 42    In relevant part, "Warm Shell Condition" was defined in Exhibit L as: "(i) Demised, with all utilities and the heating, ventilation and cooling (HVAC) system stubbed to space for Tenant distribution, drop ceiling, restrooms, plumbing and interior lighting." The parties each take conflicting views of the meaning of that language. GW argues that the word "Tenant" modifies all of the words that follow it, making each subsequent listed item an obligation of Bloom Bounce. In essence, GW reads the provision as, "Demised, with all utilities and the heating, ventilation and cooling (HVAC) system stubbed to space for Tenant distribution, [Tenant] drop ceiling, [Tenant] restrooms, [Tenant] plumbing and [Tenant] interior lighting." For support, GW cites caselaw explaining that, "[u]nder generally accepted rules of syntax, an initial modifier will tend to govern all elements in the series unless it is repeated for each element." *Washington Education Ass'n v. National Right to Work Legal Defense Foundation, Inc.*, 187 Fed. Appx. 681, 682 (9th Cir. 2006). GW further contends that its reading is supported by the deposition testimony of Goltz and Bryant explaining that in general trade usage the term "warm shell condition" means that the landlord merely brings the utilities to the space for the tenant to utilize as it desires.

¶ 43    Bloom Bounce, on the other hand, contends that, because Section 2.03 of the Lease states that the delivery of the Premises in warm shell condition shall be performed by "[GW], at [GW's] sole cost and expense," it was GW's duty to complete all of the work identified in Exhibit L. Along those lines, Bloom Bounce also observes that, if it was its responsibility to install the drop ceiling, bathrooms, plumbing, and interior lighting, then the inclusion of those items within a provision

outlining GW's obligations would be superfluous, which we must assume was not the parties' intention.

¶ 44    We do not view the provision as ambiguous and believe that the only reasonable interpretation is that GW was responsible for installing restrooms and interior lighting. When interpreting a contract, we must construe the document as a whole. *Richard W. McCarthy Trust*, 408 Ill. App. 3d at 535 (citing *Gallagher*, 226 Ill. 2d 233). Accordingly, the meaning of Exhibit L must be considered within the context of Section 2.03's statement that it was GW's sole obligation to deliver the Premises in warm shell condition. With that in mind, we cannot agree with GW's argument that the listed items were Bloom Bounce's responsibility. As Bloom Bounce points out, if that were the case, then there would be no reason to include those items in the definition of warm shell condition, the accomplishment of which was GW's sole duty. In other words, there would be no functional difference if the definition simply stated, "Demised, with all utilities and the heating, ventilation and cooling (HVAC) stubbed to space for Tenant distribution," and that result would run afoul of the principle that "it must be assumed that every provision was intended to serve a purpose." *Central Illinois Light Co. v. Home Insurance Co.*, 213 Ill. 2d 141, 153 (2004) (citing *Martindell v. Lake Shore National Bank*, 15 Ill. 2d 272, 283 (1958)). Instead, the more logical and reasonable reading of the definition is that the list set forth the specific items that GW alone was to install to place the Premises in warm shell condition.

¶ 45    Further, we are not persuaded by GW's argument that the word "Tenant" was a modifier that applied to each item in the subsequent list. Rather than being the beginning of a series, the utilities and HVAC system being stubbed for tenant distribution was itself a single item in a larger list of items that were to be present in the Premises, a list that began with "Demised, with." In

other words, the Premises were to be "Demised, with all utilities and the heating, ventilation and cooling (HVAC) system stubbed to space for Tenant distribution," and further "Demised, with *** drop ceiling, restrooms, plumbing and interior lighting."

¶ 46     We also do not believe that the testimony of Goltz and Bryant regarding the trade usage of the term "warm shell condition" should alter our interpretation of Exhibit L. Both testified that warm shell condition generally only requires the landlord to stub utilities to the space for the tenant to utilize in the manner it desires. However, Bryant, Neavolls, and Kane each testified that the term was not used consistently in the industry and that the meaning of the term varied from case to case. Further, as we have discussed, the plain language of the definition provided by the parties in this particular case made it GW's responsibility to install drop ceilings, restrooms, plumbing, and interior lighting, and trade usage cannot be considered when it contradicts the plain language of an unambiguous contract. See *Illinois Insurance Guaranty Fund v. Nwidor*, 2018 IL App (1st) 171378, ¶ 33 ("It is quite established that evidence of custom and usage is only admissible to explain uncertain or ambiguous terms of a contract. When contract terms are clear, those terms alone determine the obligations of the parties.").

¶ 47     To the extent that GW argues that the listed items could not have been its obligation because Exhibit L did not provide necessary details, such as the specific locations, quality, and quantities of the listed items, we find it implicit that such details were to be provided to GW by Bloom Bounce. In the event that Bloom Bounce failed to provide such information, which appears to have been the case regarding the interior lighting, then GW's failure to install the item at issue would have been excused. See *Empress Casino Joliet Corp. v. Averus, Inc.*, 2020 IL App (1st) 192071, ¶ 41 ("A party whose actions preclude performance by the other party may not complain

of the second party's nonperformance."); *Cenco Inc. v. Seidman & Seidman*, 686 F.2d 449, 453 (7th Cir. 1982) ("A breach of contract is excused if the promisee's hindrance or failure to cooperate prevented the promisor from performing the contract.").

¶ 48 As a final matter, we note that our conclusion that there are issues of fact precluding summary judgment on the issue of Bloom Bounce's liability for breach of contract also necessitates the reversal of the circuit court's judgment on GW's guaranty claim against Sally and Jeremy, as their liability is directly linked to Bloom Bounce's.

¶ 49 For the foregoing reasons, we reverse the circuit court's order granting the Defendants' motion for summary judgment, and we remand the matter for further proceedings consistent with this order.

¶ 50 Reversed and remanded.